Adam M. Apton (SBN 316506)
**LEVI & KORSINSKY, LLP**
aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN VREELAND, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>METAGENOMI INC., BRIAN C. THOMAS, PAMELA WAPNICK, JUERGEN ECKHARDT, SEBASTIAN BERNALES, RISA STACK, and WILLARD DERE,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br><u>Demand for Jury Trial</u> |

Plaintiff Kevin Vreeland alleges the following upon information and belief, except as to those allegations concerning themselves, which are alleged upon personal knowledge. Plaintiff's information and belief is based on the investigation of their undersigned counsel, which included, among other things, review and analysis of: (a) public statements made by or on behalf of Metagenomi Inc. ("Metagenomi" or the "Company"), including public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) press releases; (c) reports of securities and financial analysts; and (d) news articles. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE CLAIM**

1. Plaintiff brings this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, on behalf of himself and all other

shareholders that purchased stock pursuant and/or traceable to Metagenomi's registration statement for the initial public offering held between February 9 and 13, 2024.

2. Metagenomi introduced itself to investors during its initial public offering as a "genetic medicines company" having a long-standing business relationship with Moderna, one of the leading Covid-19 vaccine companies. Integral to Metagenomi's collaboration with Moderna was the claim that the two companies had entered into a Strategic Collaboration and License Agreement on October 29, 2021, which included multiple four-year research programs and a subsequent licensed product-by-licensed product agreement.

3. Under the terms of the collaboration, Metagenomi and Moderna planned to advance a series of *in vivo* gene editing therapeutics against undisclosed targets. Notably, Metagenomi was to utilize its gene editing systems in combination with Moderna's mRNA and LNP technologies, to develop and produce next-generation therapies for genetic diseases. As per the agreement, Metagenomi was to receive an upfront cash payment and was eligible to receive certain target option exercise fees as well as development, regulatory and commercial milestone payments, plus tiered royalties on net sales of any products that were commercialized by Moderna. Moderna also agreed to make an equity investment in Metagenomi in the form of a convertible note.

4. Metagenomi completed its initial public offering on February 13, 2024, selling 6.25 million shares at $15 per share. However, less than three months later, on May 1, 2024, Metagenomi announced that it and Moderna had "mutually agreed to terminate their collaboration" agreement. An analyst reported on the announcement, noting that the news was surprising, as was its timing. The analyst also noted that the partnership Metagenomi had with Moderna was a critical part of the core thesis and that losing this partnership during this early stage in development raised more questions than answers. In response to the news, Metagenomi's stock price declined from $7.04 per share on May 1, 2024 to $6.17 per share on May 2, 2024.

5. Plaintiff and other similarly situated investors bought Metagenomi stock in the initial public offering based on false and/or materially misleading information concerning its collaboration agreement with Moderna. These investors sustained damages as a result thereof.

This action seeks to compensate those investors and recover the damages they sustained because of Defendants' actions and statements.

**JURISDICTION AND VENUE**

6. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively.

7. This Court has subject matter jurisdiction over this action under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

8. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

9. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

**PARTIES**

10. Plaintiff purchased Metagenomi stock pursuant and/or traceable to Metagenomi's registration statement for the initial public offering and was damaged as a result thereof. Plaintiff's certification evidencing his transaction(s) in Metagenomi is incorporated herein by reference.

11. Defendant Metagenomi was founded in 2016 and is incorporated in the State of Delaware. Its principal executive offices are located at 5959 Horton Street, 7th Floor, in Emeryville, California 94608. Following its initial public offering, Metagenomi's stock traded on the Nasdaq under the symbol "MGX".

12. Defendant Brian C. Thomas ("Thomas") was at all relevant times Metagenomi's Chief Executive Officer. Thomas signed Metagenomi's registration statement for the initial public offering.

13. Defendants Pamela Wapnick ("Wapnick") was at all relevant times Metagenomi's Chief Financial Officer.

14. Defendants Juergen Eckhardt, Sebastian Bernales, Risa Stack, and Willard Dere were at all relevant times members of Metagenomi's Board of Directors. Collectively, these defendants are referred to as the "Director Defendants."

15. Thomas, Wapnick, and the Director Defendants:

   a. directly participated in the management of Metagenomi;
   b. were directly involved in the day-to-day operations of Metagenomi at the highest levels;
   c. were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;
   d. were directly or indirectly involved in the oversight or implementation of Metagenomi's business and/or finances, medical, or scientific research;
   e. and/or approved or ratified these statements in violation of the federal securities laws.

16. As officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the federal securities laws of the United States, Thomas, Wapnick, and the Director Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's deteriorating relationship with Moderna and to correct any previously-issued statements that had become materially misleading or untrue.

17. Thomas, Wapnick, and the Director Defendants, because of their positions with Metagenomi, possessed the power and authority to control the contents of Metagenomi's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Thomas, Wapnick, and the Director Defendants had the ability and opportunity to prevent their issuance or cause them to be corrected.

## SUBSTANTIVE ALLEGATIONS

18. In October 2021, Metagenomi and Moderna established a collaboration to develop next-generation *in vivo* gene editing therapies. Importantly, this collaboration, stemming from the Strategic Collaboration and License Agreement, combined Metagenomi's CRISPR-based

technology, along with its other novel gene editing systems, and Moderna's messenger RNA (mRNA) and lipid nanoparticles (LNP) technologies, which the companies postured would accelerate the development of *in vivo* gene editing therapies.

19. The collaboration between Metagenomi and Moderna was funded by Moderna and set to be a multi-year project, wherein Metagenomi received an upfront cash payment and was eligible to receive certain target option exercise fees as well as development, regulatory and commercial milestone payments, plus tiered royalties on net sales of any products that are commercialized by Moderna. Under the agreement, Moderna had also agreed to make an equity investment in Metagenomi in the form of a convertible note.

20. When asked about the collaboration in a November 2, 2021 press release, Defendant Thomas stated, in pertinent part:

> Gene editing has the potential to provide a cure for millions of patients living with genetic disease. Our partnership with Moderna is designed to accelerate the creation of genetic medicines using Metagenomi's naturally derived, compact, modular and precise gene editing systems. This partnership will enhance our shared vision to forge transformative therapeutics for patients.

21. In the same press release, the General Manager and Chief Scientific Officer of Moderna, Eric Huang, issued the following statement, in relevant part:

> Metagenomi has demonstrated the power of its proprietary metagenomics approach that mines the Earth's natural environment to discover next-generation gene editing tools and has developed discovery capabilities with the potential to address multiple diseases. Their discovery platform and expertise will expand Moderna Genomics' ongoing efforts to develop innovative in vivo gene editing therapies to address a significant unmet medical need. This collaboration represents another milestone on our journey to create transformational genome-engineering based medicines.

22. Particularly, at the time of Moderna's exit from the collaboration with Metagenomi the companies had been evaluating a preclinical primary hyperoxaluria type 1 (PH1) program. No unrealized payments from Moderna were included in Metagenomi's cash projections following Moderna's exit from the collaboration.

# FALSE AND MATERIALLY MISLEADING STATEMENTS

23. On January 5, 2024, Defendants filed a registration statement on Form S-1 with the SEC in connection with the Company's initial public offering. Metagenomi amended the registration statement on January 8, 2024, February 5, 2024, and February 7, 2024. On February 12, 2024, Metagenomi filed its final prospectus for the Company's initial public offering, which was incorporated into the registration statement, and listed for sale 6.25 million shares of Metagenomi common stock at an offering price of $15 per share.

24. Metagenomi's final prospectus for the initial public offering represented in no less than six separate instances the importance and benefits of Metagenomi's long-standing collaboration with Moderna. In pertinent part, the Company detailed the arrangement as follows:

> As part of our strategy, we have entered into collaborations and intend to seek to enter into additional collaborations with third parties for one or more of our programs or product candidates we may develop. For example, in October 2021, we entered into a Strategic Collaboration and License Agreement with ModernaTX, Inc. ("Moderna"), focused on advancing new genome editing system for in vivo human therapeutic applications.
>
> . . .
>
> On October 29, 2021, the effective date, we entered into a Strategic Collaboration and License Agreement (the "Moderna Agreement") with Moderna. We will collaborate with Moderna on the research and development of in vivo genome editing therapies directed at certain targets and the commercialization of such genome editing therapies. The collaboration provides Moderna with exclusive access to our technology platform during the research period in (1) the field of in vivo gene editing technology for a therapeutic, ameliorative or prophylactic application by way of knock-out through InDel formation or base editing or insertion of an exogenous DNA template (such field, "DT Field") and (2) the field of in vivo gene editing technology for a therapeutic, ameliorative or prophylactic application outside the use of (a) DNA donor templates and (b) no exogenous template at all but including (c) correction by base editing (such field, "RT Field"). The use of RIGS with mRNA and base editing correction with mRNA is within the RT Field exclusive to Moderna within the Term. We formed a joint steering committee, a joint research subcommittee and a joint patent subcommittee to oversee the collaboration activities.
>
> Under the terms of the Moderna Agreement, we and Moderna will collaborate on one or more programs in the RT Field (the "Moderna RT program") and two programs in the DT Field (the "Moderna DT program" and the "DT Co-Co program").

With respect to the Moderna RT and Moderna DT programs, we will collaborate on the research and development of product candidates under the approved research plans. **The initial research term of the Moderna RT program is four years, which may be extended by Moderna for an additional three years upon written notice and a payment of extension fees**. **The initial research term of the Moderna DT program is four years**. We granted to Moderna an option to obtain an exclusive license to develop, manufacture and commercialize up to ten Moderna RT program candidates and up to two Moderna DT program candidates at any time during the research term and prior to filing of an IND application with the FDA or any similar application filed with a regulatory authority in a country other than the United States ("U.S."), subject to Moderna's payment of an option exercise fee of $10.0 million per target.

With respect to the DT Co-Co program, we will work together with Moderna on the co-development and commercialization of products and share costs and profits equally. We maintain commercialization rights in the U.S. (subject to Moderna's right to appoint up to 50% of the U.S. sales force for the DT Co-Co program), while Moderna maintains these rights in countries other than the U.S. **The initial research term for the DT Co-Co program is four years**, and each party has a right to opt-out of the DT Co-Co program at any time, at which point the other party has the right to solely continue the development and commercialization activities. If there is no development candidate nomination by the end of the initial research term, the DT Co-Co program will expire, unless we have mutually agreed to continue the program.

. . .

For the Moderna RT and Moderna DT programs, we are eligible to receive (i) technology milestone fees related to the achievement of certain preclinical research objectives of up to $75.0 million, (ii) development and regulatory milestones of up to $100.0 million per target, (iii) sales milestones of up to $200.0 million per target, and (iv) royalties ranging from a mid-single digit to a low-teens percentage of annual net sales of a licensed product. Any profits and losses from the co-development and commercialization of the DT Co-Co program are shared equally between us and Moderna. With respect to the DT Co-Co program for which the opt-out party has exercised its opt-out right, the continuing party will pay to the opt-out party, certain development, regulatory and sales milestone payments that will not exceed an aggregate $239.0 million per DT Co-Co target, and opt-out royalties ranging from a high-single digit to a low-teens percentage of annual net sales of a licensed product.

**The term of the Moderna Agreement will continue on a licensed product-by-licensed product and country-by-country basis, until the expiration of the applicable royalty term**. The royalty term commences on the first commercial sale of a licensed product and terminates on the latest of: (a) the expiration or abandonment of the last valid claim of a patent within the licensed Moderna DT or RT technology; (b) 10 years after the first commercial sale of a licensed product; and (c) expiration of the regulatory exclusivity. Upon the expiration of the term of a licensed product in the Moderna DT or Moderna RT program, the licenses granted

to Moderna will survive and become perpetual, fully paid and royalty-free. Each party may terminate the Moderna Agreement on a program-by-program basis upon written notice to the other party for an uncured material breach or insolvency. We may terminate the Moderna Agreement upon written notice to Moderna for a patent challenge. Additionally, Moderna may terminate the agreement at its convenience with respect to Moderna DT or Moderna RT programs for any reason upon at least: (a) 60 days' prior written notice if a first commercial sale has not occurred for the products in such program, or (b) 180 days' prior written notice if a first commercial sale of a product in such program has occurred.

(Emphasis added).

25.     The statements identified above were false and/or materially misleading. Defendants heavily featured details and the benefits of Metagenomi's collaboration with Moderna in its issued prospectus and initial public offering. Importantly, Metagenomi cited to its prerogative to advance a new genome editing system for *in vivo* human therapeutic interactions, which relied on Moderna's collaboration. The depth in which Metagenomi relied on Moderna and the collaboration between the companies' provided investors with a solid basis for believing that the collaboration would be long-lasting. Importantly, Metagenomi specified that both initial research programs (RT and DT) had valid four-year terms between the two companies. At the time of the initial public offering, these four-year terms had not expired and were not set to expire until at least October 2025. Therefore, the initial public offering represented to the public that the collaboration between Metagenomi and Moderna would be lasting and would potentially lead to breakthrough scientific technologies and therapeutics.

26.     Contrary to these representations, Metagenomi's collaboration with Moderna would not extend into the future but instead terminate in the immediate future. In fact, on May 1, 2024, Metagenomi announced that it and Moderna had "mutually agreed to terminate their collaboration" agreement. Given the tenuous state of the collaboration agreement, Defendants' statements in Metagenomi's registration statement were false and/or materially misleading at the time of the initial public offering.

27.     Following the announcement, analysts and news outlets reported on the development. In pertinent part, they noted that the timing of the news as well as the announcement itself was surprising. One analyst noted that the partnership Metagenomi had with Moderna was a

1   critical part of the core thesis and that losing this partnership during this early stage in development
2   raised more questions than answers. In response to the news, Metagenomi's stock price declined
3   from $7.04 per share on May 1, 2024 to $6.17 per share on May 2, 2024.

4       28.    Metagenomi's stock currently trades at or around $2.15 per share, which is well
5   below its $15 per-share initial public offering price.

## CLASS ACTION ALLEGATIONS

7       29.    Plaintiff bring this action on behalf of himself and all other shareholders that
8   purchased stock pursuant and/or traceable to Metagenomi's registration statement for the initial
9   public offering held between February 9 and 13, 2024, and were damaged thereby (the "Class").
10  Excluded from the Class are Defendants each of their immediate family members, legal
11  representatives, heirs, successors or assigns, and any entity in which any of the Defendants have
12  or had a controlling interest.

13      30.    The Class members are so numerous that joinder of all members is impracticable.
14  While the exact number of Class members is unknown at this time and can be ascertained only
15  through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members
16  in the proposed Class. Record owners and other Class members may be identified from records
17  maintained by Metagenomi or its transfer agent and may be notified of the pendency of this action
18  by mail, using the form of notice similar to that customarily used in securities class actions. In the
19  initial public offering itself, Metagenomi sold 6.25 million shares. Upon information and belief,
20  these shares are held by hundreds or thousands of individuals located throughout the world. Joinder
21  would be highly impracticable.

22      31.    Plaintiff's claims are typical of the claims of the Class members as all Class
23  members are similarly affected by the Defendants' respective wrongful conduct in violation of the
24  federal laws complained of herein.

25      32.    Plaintiff has and will continue to fairly and adequately protect the interests of the
26  Class members and has retained counsel competent and experienced in class and securities
27  litigation. Plaintiffs has no interests antagonistic to or in conflict with those of the Class.

33. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of law and fact common to the Class are:

   (a) whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;

   (b) whether the price of Metagenomi's securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and

   (c) whether the Class members have sustained damages and, if so, what is the proper measure of damages.

34. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violation of Section 11 of the Securities Act against Defendants**

35. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

36. This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiff and other members of the Class against Defendants.

37. Metagenomi's registration statement and prospectus for the initial public offering were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

38. Metagenomi is the issuer of the securities purchased by Plaintiff and other members of the Class. As such, Metagenomi is strictly liable for the materially untrue statements contained in the registration statement and prospectus and their failure to be complete and accurate.

39. Thomas, Wapnick, and the Director Defendants each signed the registration statement filed by Metagenomi for its initial public offering. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the registration statement and prospectus to be complete and accurate. Thomas, Wapnick, and the Director Defendants named herein were responsible for the contents and dissemination of the registration statement and prospectus, which were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Thomas, Wapnick, and the Director Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the registration statement and prospectus and ensure that they were true and accurate and not misleading. In the exercise of reasonable care, Thomas, Wapnick, and the Director Defendants should have known of the material misstatements and omissions contained in the registration statement and prospectus. Accordingly, Thomas, Wapnick, and the Director Defendants are liable to Plaintiffs and the other members of the Class.

40. By reason of the conduct alleged herein, Defendants violated Section 11 of the Securities Act.

41. Plaintiff and the other members of the Class acquired Metagenomi common stock pursuant or traceable to the Company's registration statement and prospectus filed in conjunction with the initial public offering and without knowledge of the untruths and/or omissions alleged herein. Plaintiff and the other members of the Class sustained damages, and the price of Metagenomi's shares declined substantially due to material misstatements in the registration statement and prospectus.

42. This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the initial public offering.

43. By virtue of the foregoing, Plaintiff and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

# COUNT II

### Violation of Section 15 of the Securities Act

### against Thomas, Wapnick, and the Director Defendants

44. Plaintiff repeats and realleges each and every allegation contained in Count I, *supra*. Plaintiff specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

45. This Count is brought by Plaintiff against Thomas, Wapnick, and the Director Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

46. This Count is asserted against Thomas, Wapnick, and the Director Defendants, each of whom possessed the power to control, and did control, directly and/or indirectly, the actions of Metagenomi at all relevant times.

47. Thomas, Wapnick, and the Director Defendants were each control persons of Metagenomi by virtue of their positions as directors, senior officers, and/or authorized representatives of the Company. Thomas, Wapnick, and the Director Defendants had the power and authority to control the contents of Metagenomi's registration statement and prospectus and had the ability and opportunity to prevent their issuance or cause them to be corrected.

48. As a direct and proximate result of said wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchase of Metagenomi securities.

49. This claim is brought within the applicable statute of limitations.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment as follows:

(a) Determining that this action is a proper class action, certifying Plaintiff as a class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

(b) Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages

sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

Dated: September 26, 2024

Respectfully submitted,

**LEVI & KORSINSKY, LLP**

*/s/ Adam M. Apton*
Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
1160 Battery Street East, Suite 100
San Francisco, CA 94111
Tel.: (415) 373-1671

*Attorneys for Plaintiff*