Michael J. Boyle, Jr. (SBN 258560)
BRONSTEIN GEWIRTZ & GROSSMAN, LLC
mboyle@bgandg.com
4200 Regent Street, Suite 200
Columbus, OH 43219
T: (614) 578-5582

Jennifer Pafiti (SBN 282790
POMERANTZ, LLP
jpafiti@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
T: (310) 405-7190

Attorneys for Plaintiffs

[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| KEVIN VREELAND, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>METAGENOMI INC., BRIAN C. THOMAS, PAMELA WAPNICK. JUERGEN ECKHARDT, SEBASTIAN BERNALES, RISA STACK, and WILLARD DERE,<br><br>Defendants. | Case No.: 5:24-cv-06765<br><br>**FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**CLASS ACTION**<br><br>**DEMAND FOR JURY TRIAL** |

Lead Plaintiff Mingxi Bi, and additional Plaintiffs Kevin Vreeland, Robert Mohr III, and Aditya Thakur (hereafter "Plaintiffs") allege the following upon information and belief, except as to those allegations concerning themselves, which are alleged upon personal knowledge. Plaintiffs' information and belief is based on the investigation of their undersigned counsel, which included, among other things, review and analysis of: (a) public statements made by or on behalf of Metagenomi Inc. ("Metagenomi" or the "Company"), including public filings with the U.S. Securities

and Exchange Commission ("SEC"); (b) press releases; (c) reports of securities and financial analysts; (d) news articles; and (e) interviews with former Metagenomi employees (who have asked to be identified as "confidential witnesses"). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE CASE

1. Plaintiffs bring this action pursuant to Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77k and 77o, on behalf of himself and all other shareholders that purchased stock pursuant and/or traceable to Metagenomi's registration statement for the initial public offering held between February 9 and 13, 2024.

2. Metagenomi introduced itself to investors during its initial public offering as a "genetic medicines company" having a long-standing business relationship with Moderna, one of the leading Covid-19 vaccine companies. Integral to Metagenomi's collaboration with Moderna was the claim that the two companies had entered into a Strategic Collaboration and License Agreement on October 29, 2021, which included multiple four-year research programs and a subsequent licensed product-by-licensed product agreement.

3. Under the terms of the collaboration, Metagenomi and Moderna planned to advance a series of in vivo gene editing therapeutics against undisclosed targets. Notably, Metagenomi was to utilize its gene editing systems in combination with Moderna's mRNA and LNP technologies, to develop and produce next-generation therapies for genetic diseases. As per the agreement, Metagenomi was to receive an upfront cash payment and was eligible to receive certain target option exercise fees as well as development, regulatory and commercial milestone payments, plus tiered royalties on net sales of any products that were commercialized by Moderna. Moderna also agreed to make an equity investment in Metagenomi in the form of a convertible note.

4. By the middle of 2023, the relationship between Moderna and Metagenomi was falling apart. According to former Metagenomi employees,

Moderna was pulling back on its funding of the joint projects, becoming increasingly skeptical and critical of Metagenomi's processes and staffing. By the end of 2023, meetings between the two companies had become screaming matches that could be heard by other Metagenomi employees working in the same building. By the beginning of 2024, these same meetings were going unattended by the principals of either company.

5. In parallel to these problems, the projects themselves were in serious trouble. Leadership turn-over from the Metagenomi was high, and the Moderna projects were seen internally as so toxic that supervisors were shielding promising subordinates from having to work on them. One former Metagenomi employee, who was brought in to coordinate the first stage of testing for the joint projects, says that none of the necessary preparation for these tests had been undertaken as of late 2023.

6. An honest assessment by Metagenomi in early 2024 of the Moderna projects would have stated that these projects were on life support, and many Metagenomi employees were discussing the cancellationof these projects. Instead, in early 2024 Metagenomi published an IPO Prospectus that not only failed to disclose any of these problems, but trumpeted the Moderna relationship and made promises of completion of the first phase of testing on a key product by the end of 2024. The IPO paints a picture of a healthy, sustainable, soon-to-be profitable relationship between Moderna and Metagenomi. None of that was true.

7. Metagenomi completed its initial public offering on February 13, 2024, selling 6.25 million shares at $15 per share. However, less than three months later, on May 1, 2024, Metagenomi announced that it and Moderna had "mutually agreed to terminate their collaboration" agreement. An analyst reported on the announcement, noting that the news was surprising, as was its timing. The analyst also noted that the partnership Metagenomi had with Moderna was a critical part of Metagenomi's pitch to investors and that losing this partnership during this early stage in development raised more questions than answers. In response to the news, Metagenomi's stock price declined from $7.04 per share on May 1, 2024, to $6.17 per share on May 2, 2024.

8. Plaintiffs and other similarly situated investors bought Metagenomi stock in the initial public offering based on false and/or materially misleading information concerning its collaboration agreement with Moderna. These investors sustained damages as a result thereof. This action seeks to compensate those investors and recover the damages they sustained because of Defendants' actions and statements.

## JURISDICTION AND VENUE

9. The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o, respectively.

10. This Court has subject matter jurisdiction over this action under Section 22 of the Securities Act (15 U.S.C. § 77v) and 28 U.S.C. § 1331.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly and/or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications, and the facilities of the national securities exchange.

12. Venue is proper in this District pursuant to Section 22 of the Securities Act and 28 U.S.C. § 1391(b) because certain of the acts alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in this District.

## PARTIES

13. Lead Plaintiff Mingxi Bi purchased Metagenomi stock within the Class Period, as set forth in the previously filed certification (Dkt. No. 12-5).

14. Plaintiff Kevin Vreeland purchased Metagenomi stock within the Class Period, as set forth in the previously filed certification (Dkt. No. 1-2).

15. Plaintiff Robert E. Mohr III purchased Metagenomi stock within the Class Period, as set forth in the previously filed certification (Dkt. No. 9-2).

16. Plaintiff Aditya Thakur purchases Metagenomi stock within the Class Period, as set forth in the certification attached as Exhibit 1.

17. Defendant Metagenomi was founded in 2016 and is incorporated in the

State of Delaware. Its principal executive offices are located at 5959 Horton Street, 7th Floor, in Emeryville, California 94608. Following its initial public offering, Metagenomi's stock traded on the Nasdaq under the symbol "MGX."

18. Defendant Brian C. Thomas ("Thomas") was at all relevant times Metagenomi's Chief Executive Officer. Thomas signed Metagenomi's registration statement for the initial public offering.

19. Defendant Pamela Wapnick ("Wapnick") was at all relevant times Metagenomi's Chief Financial Officer.

20. Defendants Juergen Eckhardt, Sebastian Bernales, Risa Stack, and Willard Dere were at all relevant times members of Metagenomi's Board of Directors. Collectively, these defendants are referred to as the "Director Defendants."

21. Thomas, Wapnick, and the Director Defendants:

a. directly participated in the management of Metagenomi;
b. were directly involved in the day-to-day operations of Metagenomi at the highest levels;
c. were directly or indirectly involved in the oversight or implementation of Metagenomi's business and/or finances, medical, or scientific research;
d. were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the statements and information alleged herein;
e. signed the Registration Statement;
f. and/or approved or ratified these statements in violation of the federal securities laws.

22. As officers of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the federal securities laws of the United States, Thomas, Wapnick, and the Director Defendants each had a duty to disseminate prompt, accurate, and complete information with respect to the Company's deteriorating relationship with Moderna and to correct any previously-issued statements that had become materially misleading or untrue.

23. Thomas, Wapnick, and the Director Defendants, because of their

positions with Metagenomi, possessed the power and authority to control the contents of Metagenomi's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market. Thomas, Wapnick, and the Director Defendants had the ability and opportunity to prevent their issuance or cause them to be corrected.

24. Plaintiffs do not allege nor claim to have information supporting a claim for intentional or fraudulent misconduct. This pleading is based entirely on allegations of negligent or mistaken misstatements and/or omissions.

## SUBSTANTIVE ALLEGATIONS

### 1. Metagenomi Touts Its Collaboration with Moderna in Its IPO.

25. On October 29, 2021, Metagenomi and Moderna established a collaboration to develop next-generation in vivo gene editing therapies. Importantly, this collaboration, stemming from a Strategic Collaboration and License Agreement (hereafter "SCLA") between Metagenomi and Moderna, combined Metagenomi's CRISPR-based technology, along with its other novel gene editing systems, and Moderna's messenger RNA (mRNA) and lipid nanoparticles (LNP) technologies, which the companies portrayed as accelerating the development of *in vivo* gene editing therapies.

26. The collaboration between Metagenomi and Moderna was funded by Moderna and set to be a multi-year project. Moderna provided an up-front payment of $40 million plus a $5 million payment for research costs. Exhibit 2 (IPO Prospectus), at 103. Moderna also invested in Metagenomi directly in the form of a $30 million promissory note that was converted by Moderna into Metagenomi stock. Exhibit 2, *id*. In return for this cash infusion, Moderna would either have the exclusive license to market and sell the fruits of the research collaboration or share jointly with Metagenomi in the marketing and sale of such products. Exhibit 2, *id.*

27. The SCLA called for the research and development component of the agreement to last for four years, with an option to extend parts of the agreement for an additional three years. Exhibit 2, at 103. If or when a product came to market, the

license agreement was to continue on a product-by-product basis for ten years or until the end of any patent protections. *Id.*

28. In a November 2, 2021, press release, the General Manager and Chief Scientific Officer of Moderna, Eric Huang, issued the following statement,[1] in relevant part:

> Metagenomi has demonstrated the power of its proprietary metagenomics approach that mines the Earth's natural environment to discover next-generation gene editing tools and has developed discovery capabilities with the potential to address multiple diseases. Their discovery platform and expertise will expand Moderna Genomics' ongoing efforts to develop innovative in vivo gene editing therapies to address a significant unmet medical need. This collaboration represents another milestone on our journey to create transformational genome-engineering based medicines.

29. In the same press release, Defendant Thomas stated, in pertinent part:

> Gene editing has the potential to provide a cure for millions of patients living with genetic disease. Our partnership with Moderna is designed to accelerate the creation of genetic medicines using Metagenomi's naturally derived, compact, modular and precise gene editing systems. This partnership will enhance our shared vision to forge transformative therapeutics for patients.

30. The heart of the SCLA is an agreement between Moderna and Metagenomi to collaborate on several projects. As described by Metagenomi in the February 13, 2024 IPO Prospectus:

> ***On October 29, 2021, the effective date, we entered into a Strategic Collaboration and License Agreement (the "Moderna Agreement") with Moderna. We will collaborate with Moderna on the research and development of in vivo genome editing therapies directed at certain targets and the commercialization of such genome editing therapies.*** The collaboration provides Moderna with exclusive access to our technology platform during the research period in (1) the field of *in vivo* gene editing technology for a therapeutic, ameliorative or prophylactic application by way of knock-out

---

[1] https://investors.modernatx.com/news/news-details/2021/Moderna-and-Metagenomi-Establish-Collaboration-to-Develop-Next-Generation-In-Vivo-Gene-Editing-Therapeutics/default.aspx (last accessed March 25, 2025).

through InDel formation or base editing or insertion of an exogenous DNA template (such field, "DT Field") and (2) the field of *in vivo* gene editing technology for a therapeutic, ameliorative or prophylactic application outside the use of (a) DNA donor templates and (b) no exogenous template at all but including (c) correction by base editing (such field, "RT Field"). The use of RIGS with mRNA and base editing correction with mRNA is within the RT Field exclusive to Moderna within the Term. We formed a joint steering committee, a joint research subcommittee and a joint patent subcommittee to oversee the collaboration activities.

***Under the terms of the Moderna Agreement, we and Moderna will collaborate on one or more programs in the RT Field (the "Moderna RT program") and two programs in the DT Field (the "Moderna DT program" and the "DT Co-Co program").***

With respect to the Moderna RT and Moderna DT programs, we will collaborate on the research and development of product candidates under the approved research plans. The initial research term of the Moderna RT program is four years, which may be extended by Moderna for an additional three years upon written notice and a payment of extension fees. The initial research term of the Moderna DT program is four years. We granted to Moderna an option to obtain an exclusive license to develop, manufacture and commercialize up to ten Moderna RT program candidates and up to two Moderna DT program candidates at any time during the research term and prior to filing of an IND application with the FDA or any similar application filed with a regulatory authority in a country other than the United States ("U.S."), subject to Moderna's payment of an option exercise fee of $10.0 million per target.

With respect to the DT Co-Co program, we will work together with Moderna on the co-development and commercialization of products and share costs and profits equally. We maintain commercialization rights in the U.S. (subject to Moderna's right to appoint up to 50% of the U.S. sales force for the DT Co-Co program), while Moderna maintains these rights in countries other than the U.S. The initial research term for the DT Co-Co program is four years, and each party has a right to opt-out of the DT Co-Co program at any time, at which point the other party has the right to solely continue the development and commercialization activities. If there is no development candidate nomination by the end of the initial research term, the DT Co-Co program will expire, unless we have mutually agreed to continue the program.

Exhibit 2, at 103.

31. Under the SCLA, one of the projects Metagenomi and Moderna were collaborating on was a preclinical primary hyperoxaluria type 1 (PH1) program. As described by Metagenomi in the IPO Prospectus:

> PH1 is a rare autosomal recessive metabolic disease arising from loss of function mutations in the alanine-glyoxylate aminotransferase ("AGXT") gene that encodes alanine glyoxylate aminotransferase. This enzyme is found in peroxisomes of the liver where it catalyzes the conversion of glyoxylate to glycine and pyruvate. Lack of functional AGXT leads to an accumulation of glyoxylate substrate, which is then converted to oxalate and excreted in the kidney. The excess urinary oxalate forms an insoluble complex with urinary calcium that leads to the production of calcium oxalate crystal precipitates. This pathologic process results in the formation of repeated calcium oxalate urolithiasis and nephrolithiasis, which in turn leads to obstructive uropathy, inflammation, fibrosis, tubular toxicity, and progressive loss of kidney function. PH1 is a serious disease that causes kidney failure. More than 70% of individuals with PH1 mutations will develop end-stage renal disease, with a median age in young adulthood.
>
> The goal of our genome editing approach is to durably knock down HAO1 resulting in stable and permanent reduction of oxalate levels to effect a lifelong benefit. We have performed nuclease and guide screening to select an optimal nuclease and gRNA combination. ***Along with our partner ModernaTX, Inc. ("Moderna"), we have achieved preclinical proof-of-concept in an AGXT knock-out mouse which is an accepted disease model of PH1. We are in the final stages of confirming the candidate to take into NHP studies and expect to have NHP data in 2024 to support final development candidate selection***.

Exhibit 1, at 5.

32. The PH1 Program was described by the IPO Prospectus as moving toward generating a commercial product. More specifically, the IPO Prospectus described the PH1 project as moving into non-human primate (NHP) studies, a key milestone on the path to a marketable product, in 2024:

> ***We are in the final stages of confirming the candidate to take into NHP studies and expect to have NHP data in 2024 to support final development candidate selection***.
>
> ***This program is partnered with Moderna for both development and***

> ***commercialization. The partnership enables us to leverage Moderna's expertise in mRNA and LNP technology to ensure efficient delivery of our nuclease to hepatocytes. In turn, we provide the novel programmable nuclease and guide chemistry to support precise targeting of the HAO1 genes. In addition to further validating our therapeutic platform, to the best of our knowledge this program represents the first time a type V nuclease is being developed for a therapeutic in vivo genome editing approach.***

Exhibit 2, at 184.

33. On January 5, 2024, Defendants filed a Registration Statement on Form S-1 with the SEC in connection with the Company's initial public offering. Metagenomi amended the Registration Statement on January 8, 2024, February 5, 2024, and February 7, 2024. On February 12, 2024, Metagenomi filed its final Prospectus for the Company's initial public offering, which was incorporated into the Registration Statement, and listed for sale 6.25 million shares of Metagenomi common stock at an offering price of $15 per share.

34. As seen in the IPO Prospectus, the relationship with Moderna was a core part of Metagenomi's pitch to potential investors, with Moderna providing both financial support and credibility to Metagenomi's operations.

35. The IPO was successful. Metagenomi raised $93.8 million in gross proceeds from the IPO, which translated into $81.1 million in proceeds after deduction of underwriting discounts and offering costs. Exhibit 3 (Metagenomi 10-K, dated March 27, 2024), at 137.

36. Plaintiffs purchased Metagenomi stock pursuant to the Registration Statement.

**2. Unknown to Investors, The Relationship Between Moderna and Metagenomi Had Deteriorated Prior to the IPO.**

37. As seen in the IPO Prospectus, the relationship with Moderna was a core part of Metagenomi's pitch to potential investors. The IPO Prospectus represented that Moderna and Metagenomi would actively collaborate on the development of commercial products.

38. Moreover, the IPO Prospectus represented that the PH1 project was about

to move into non-human primate (NHP) studies, a key milestone on the path to a marketable product, in 2024. Exhibit 2, at 184. Thus, Metagenomi was telling potential investors that the Moderna relationship was not only important to Metagenomi's research operations, but also likely to result in a profitable product for Metagenomi in a reasonable time frame.

39. The reality of the relationship between Metagenomi and Moderna was very different from the portrayal in the IPO Prospectus.

40. Several confidential witnesses reported that the relationship between Moderna and Metagenomi began deteriorating in mid-2023. CW1, a Researcher at Metagenomi from March 2022 to November 2024 and who was hired specifically to work on the Moderna-partnered research projects, reports that when CW1 began working with Moderna in 2022, CW1 observed no difficulties or concerns with funding; "money was no issue." However, beginning in Q2 2023, Moderna began exercising tough cost controls on the joint projects, demanding detailed cost accounting from Metagenomi and reduced the number of clinical trials they would approve and fund. CW1 was also involved in planning meetings where "there appeared to be a lot of pressure for Metagenomi to get this technology to work but dwindling resources to do it." Indeed, one of CW1's project leaders left the Company "out of frustration that the team was expected to continue with the program with dwindling resources."

41. In addition, CW1 reported signs emerging in 2023 that Moderna was not happy with the data coming out of Metagenomi. One Moderna-collaboration project "was showing some problems in producing data that the technology was effective," "signs starting in 2023."

42. Moreover, CW1 reports that Moderna had developed an in-house team to work on a segment of the Metagenomi projects in late 2022. This group was shut down by Moderna in mid-2023, without a clear reason or explanation.

43. CW4, who worked for Metagenomi as a high-level financial planning and analysis executive from October 2022 to February 2024, confirms that Moderna increased its oversight of the finances of the joint project beginning in late 2023 and

into 2024. CW4 reports that Moderna rejected the proposed 2024 budget for the joint projects. In particular, Moderna challenged the staffing proposals for the joint projects, "push[ing] back and challeng[ing] every FTE [Full Time Equivalent]" proposed by Metagenomi for the joint projects.

44. One additional source of tension between Moderna and Metagenomi related to research products being produced by Metagenomi. CW5, a Researcher at Metagenomi from February 2022 to March 2024 who worked on the joint projects with Moderna, reported that in August 2023 Metagenomi submitted a "specificity package" to Moderna, which demonstrated the accuracy of Metagenomi's gene editing technology. Moderna rejected this data in August 2023 as "not meeting its expectations," as incorrect or inaccurate, resulting in the termination of a Metagenomi Vice President connected to the project. Indeed, earlier 2023, CW5 "caught a major error in how the Moderna partnership team may have been cross referencing the gene editor" which could have been the cause.

45. CW2, who was Senior Director who was directly involved in the Moderna collaboration for the PH1 program from October 2023 through June 2024. At the time CW2 began working on the PH1 project, he reported that Moderna and Metagenomi were conducting regular bi-weekly meetings with high level personnel from both sides participating. When CW2 first joined in October 2023, the meetings seemed productive with regular discussion about what the program would accomplish by the first two quarters of 2024. By the beginning of 2024, prior to the IPO, those meetings became very tense. CW2 reports that Moderna were "really nitpicky" about reporting from Metagenomi, and "[t]hen people would be yelling at each other in those meetings about those research plans and how things are proceeding."

46. CW2 confirmed that Metagenomi's staffing proposals—and the corresponding project costs—were a focus of the conflict between Moderna and Metagenomi. In addition, according to CW2, Moderna was "unhappy with the preclinical research that was being done" when CW2 joined the company in October 2023. Moderna became "increasingly unhappy" with the project in January 2024. In one of these meetings "where tempers flared," CW2 recalls some discussion about

how Moderna was "filling in the gaps" for Metagenomi and some questions about "whether that should have been done or not."

47. Then those meetings "suddenly stopped," CW2 said. By February or March 2024, CW2 said that the biweekly meetings were still on the calendar, but no one attended. By February 2024, these joint meetings remained on calendar, but CW2 reported that no one from either side attended those meetings as of the beginning of 2024. "For me, it was obvious Moderna was pulling out before it got announced," CW2 said.

48. CW5 reports that the Metagenomi project team was acutely aware of the deterioration of the Moderna relationship by the fall of 2023. CW5 reported that among those that worked with Moderna "[a] lot of people on the project knew it was dead in the water" by November 2023. According to CW5, communication between Metagenomi and Moderna stopped well before the IPO in February 2024 "because the relationship was so bad."

49. CW3, a program manager at Metagenomi from January 2023 to October 2024, reports that CW3 was told by CW3's manager that the Moderna programs were "a little messy right now in meetings." Moreover, CW3's manager took active steps to "shield" CW3 from working on the Moderna projects due to their contentious nature.

50. CW3 also reports that the confrontations described by CW2 between Moderna and Metagenomi personnel in meetings were audible to other Metagenomi employees and were a topic of conversation in Metagenomi circles.

### 3. Unknown to Investors, Metagenomi Had Made No Progress On The Moderna-Funded PH1 Program Prior to the IPO.

51. CW2 was a Senior Director who was directly involved in the Moderna collaboration for the PH1 program from October 2023 through June 2024. CW2 was particularly involved in preparing PH1 for FDA approval, but CW2 inherited a program that CW2 believed was directionless and not ready to move to the clinical trial stage. CW2 reported that when CW2 joined Metagenomi in October 2023, a group of junior scientists were responsible for the gene sequencing work as part of the

Moderna partnership, but "they had no goals or direction on what they should be doing to prepare the technology for an Investigational New Drug (IND) application filing."

52. The Company's statement in the Prospectus that "We are in the final stages of confirming the candidate to take into NHP studies and expect to have NHP data in 2024 to support final development candidate selection" struck CW2 as "odd because it costs millions of dollars and months of planning to execute trials with nonhuman primate (NHP) models." But in none of the meetings or work that CW2 participated in were there any discussions of securing a facility, materials or a contractor to test the Company's HOA1 gene editor (necessary for the PH1 project) on nonhuman primates.

53. Based on CW2's knowledge of the development pipeline for similar products, CW2 believes that the PH1 program was not in a position to begin NHP studies in 2024. These studies require significant preparation in order to implement, including securing a facility. In CW2's professional experience, in order to obtain study data by the end of 2024, these preparation efforts should have been well in progress as of the IPO in February 2024. But in "none of the meetings or work" that CW2 participated in were there any discussions of securing a facility, materials or a contractor to test the Company's gene editor on nonhuman primates. CW2 reports that no meaningful work had been done on these preparation efforts at the time the partnership with Moderna ended in May.

**4. Less Than Three Months After the IPO, Moderna Publicly Terminates the SCLA with Metagenomi.**

54. On May 1, 2024, Metagenomi announced that the partnership with Moderna had been terminated.[2] In its press release, Metagenomi framed the move as "regain[ing] full development rights to its wholly-owned base editing and RIGS systems."[3]

55. Following the announcement, analysts and news outlets reported on the

[2] https://metagenomi.co/news/metagenomi-to-regain-full-development-rights-to-its-wholly-owned-base-editing-and-rigs-systems (last accessed March 26, 2025).

[3] *See also* Exhibit 4 (Metagenomi 8-K, dated May 1, 2024) (disclosing an investor presentation focused on the talking point of "regaining full rights" in Metagenomi technology projects).

development. In pertinent part, they noted that the timing of the news as well as the announcement itself was "very surprising" and that the Moderna partnership was framed by Metagenomi as "a critical part of [its] core thesis."[4] For instance, J.P. Morgan "lowered its rating of Metagenomi," citing "the recent termination of its partnership with Moderna," with "[t]he investment bank sa[ying] it was 'very surprised' by … [the] termination news," and that "losing a partner like Moderna at this early stage in development raises more questions than answers."

56. The termination of the Agreement only three months after Metagenomi's touting it in the Registration Statement gives rise to a reasonable inference, coupled with the reports of the confidential witnesses all intimately familiar with the Moderna relationship, that the Moderna joint venture was either in major distress, or effectively terminated, by at the time of the IPO. One analyst noted that losing the partnership Metagenomi had with Moderna "removes a potential source of incoming cash in the form of milestone payments as well as the expertise that the larger company offered in messenger RNA."[5]

57. The market agreed with the conclusion that the termination of the Moderna deal was a material blow to Metagenomi. Metagenomi's stock price declined from $7.04 per share on May 1, 2024, to $6.17 per share on May 2, 2024.

58. The decline in Metagenomi stock has continued steadily since the announcement. Indeed, Metagenomi's Chief Science Officer responsible for "oversee[ing] the discovery and systematic advancement of the Company's next-generation gene editing technologies to accelerate their pathway to clinical translation for in vivo and ex vivo applications" resigned in July 2024.[6] This departure was seen as another indication of the weakness of Metagenomi's research program. Moreover, given the timing involved, it was likely a direct result of the breakdown of the Moderna relationship. Following this announcement, the stock dropped from a high of $5.25 to

---

4 https://seekingalpha.com/news/4099011-jp-morgan-downgrades-metagenomi-over-moderna-deal-termination (last accessed March 26, 2025).

5 https://www.biopharmadive.com/news/moderna-metagenomi-terminate-end-gene-editing-alliance/714981/ (last accessed March 26, 2025).

6 https://metagenomi.co/news/metagenomi-appoints-luis-borges-ph-d-as-chief-scientific-officer-and-pamela-wapnick-mba-as-chief-financial-officer-2 (last accessed April 4, 2025).

$3.88 by the end of July.

59. As of March 26, 2025, Metagenomi trades at $1.60 per share.

**FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS MADE BY DEFENDANTS**

60. As set forth above, Metagenomi made several statements in its IPO Prospectus that were either false or omitted material facts.

61. First, a core element of Metagenomi's pitch to investors was that its relationship with Moderna should be viewed not only a indicia of confidence in the viability of Metagenomi as a company, but also a collaboration that was likely to give rise to profitable products in a reasonable time frame.

62. More specifically, the IPO Prospectus makes clear that Moderna and Metagenomi would actively collaborate on a series of projects.

63. In fact, at the time of the IPO, the relationship between Moderna and Metagenomi had significantly deteriorated. Meetings between Moderna and Metagenomi principals had gone from friendly collaboration pre-2023 to angry yelling matches to no meetings at all by February 2024. Metagenomi employees were speculating on when Moderna would terminate the partnership.

64. Simply put, at the time of the IPO, Moderna and Metagenomi were not functionally collaborating on the projects described in the Prospectus. Whatever the reason for the breakdown of the relationship, at the time of the IPO, Metagenomi employees knew that the relationship with Moderna was likely to be terminated in the near future.

65. Metagenomi had a duty to disclose this information to future shareholders in its IPO prospectus. Instead, even if mistakenly or negligently, Metagenomi did the opposite, highlighting its relationship with Moderna as a core reason to invest in Metagenomi.

66. Likewise, Metagenomi highlighted a number of projects, especially the PH1 program, that were presented as making good progress toward becoming viable commercial projects with the aid of Moderna. Not only was the Moderna relationship in its last days, but the projects themselves were far behind schedule.

67. Indeed, Metagenomi's representation that PH1 program was going to be receiving data from NHP studies by the end of 2024 is undermined by the fact that Metagenomi had not engaged in the preparations necessary to conduct those studies. At a minimum, these representations were so optimistic that Metagenomi had a duty to describe the concrete steps it would take to make these representations feasible in the time frame provided.

**Metagenomi's Registration Statement Did Not Comply with SEC Disclosure Requirements.**

68. Metagenomi's SEC filings identified above also failed to identify and disclose known trends, events, demands, commitments, and uncertainties that were then having and were reasonably likely to have a material effect on Metagenomi's operating performance.

69. Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required in the "Risk Factors" section of filings "a discussion of the [most significant] factors that make [the offering] . . . speculative or risky" and requires each risk factor to "adequately describe[] the risk."

70. Metagenomi made a series of generic disclosures in its IPO Prospectus regarding risk related to its strategic partnerships. For example, the Prospectus states:

> We have entered into collaborations, and may enter into additional collaborations, with third parties for research, development, manufacture and commercialization of programs or product candidates. If these collaborations are not successful, our business could be adversely affected.

Exhibit 2, at 56.

71. In the same section, while the Prospectus names Moderna as a collaboration partner, it merely lists a series of generic, forward-looking possibilities regarding potential problems with collaborations. At no point is there a mention of the *actual* difficulties Metagenomi was having with Moderna. At the time of the release of the Prospectus, problems in "collaborations" were not hypothetical but actual.

72. Thus, the disclosures in the IPO Prospectus it filed with the SEC during

the Class Period were materially false and misleading because Defendants failed to disclose the known problems with the Moderna relationship. As a result, these were events presenting known trends, uncertainties, and risks that were reasonably likely to—and, when they came to fruition during the Class Period, did—adversely affect Metagenomi's financial condition and results. The omission of this information violated the disclosure obligation imposed by Item 105.

73. Moreover, as discussed above, Metagenomi's Chief Science Officer, Luis Borges, departed the Company in the aftermath of the collapse of the Moderna partnership, just five months after the IPO. The risk and, indeed likelihood, of Borges' departure in connection with the termination of the Moderna relationship was a material fact that should have been disclosed in the Prospectus in the context of its research program. The omission of this information violated the disclosure obligation imposed by Item 105.

## CLASS ACTION ALLEGATIONS

74. Pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of himself and the following class (the "Class"):

> All shareholders that purchased stock pursuant and/or traceable to Metagenomi's registration statement for the initial public offering held between February 9 and 13, 2024, and were damaged thereby.

75. Excluded from the Class are Defendants each of their immediate family members, legal representatives, heirs, successors or assigns, and any entity in which any of the Defendants have or had a controlling interest.

76. *Numerosity*: The Class members are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other Class members may be identified from records maintained by Metagenomi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions. In the

initial public offering itself, Metagenomi sold 6.25 million shares. Upon information and belief, these shares are held by hundreds or thousands of individuals located throughout the world. Joinder would be highly impracticable.

77. *Commonality.* Common questions of law and fact exist as to all Class members. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by the Defendants' respective acts as alleged herein;
b. whether the price of Metagenomi's securities during the Class Period was artificially inflated because of the Defendants' conduct complained of herein; and
c. whether the Class members have sustained damages and, if so, what is the proper measure of damages.

78. *Typicality*: Plaintiffs' claims are typical of the claims of the Class members as all Class members are similarly affected by the Defendants' respective wrongful conduct in violation of the federal laws complained of herein.

79. *Adequate Representation*: Plaintiffs will fairly and adequately protect the interests of the Class Members and has no interests antagonistic to those of the Class. Plaintiffs have retained counsel experienced in the prosecution of complex class actions including, but not limited to, securities litigation.

80. *Predominance*: This class action is appropriate for certification because questions of law and fact common to Class Members predominate over questions affecting only individual members.

81. *Superiority*: A class action is superior to other available methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable. Should individual Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In addition, because the damages suffered by each Class Member are relatively small compared to the expense and burden of prosecuting this case, this class action is the most efficient and effective wat Class Member can redress

the harm they have suffered.

**COUNT I**

**Violation of Section 11 of the Securities Act**

**Against All Defendants**

82. Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.

83. This count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of Plaintiffs and other members of the Class against Defendants.

84. Metagenomi's registration statement and prospectus for the initial public offering were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

85. Metagenomi is the issuer of the securities purchased by Plaintiffs and other members of the Class. As such, Metagenomi is strictly liable for the materially untrue statements contained in the registration statement and prospectus and their failure to be complete and accurate."

86. Thomas, Wapnick, and the Director Defendants each signed the registration statement filed by Metagenomi for its initial public offering. As such, each is strictly liable for the materially inaccurate statements contained therein and the failure of the registration statement and prospectus to be complete and accurate. Thomas, Wapnick, and the Director Defendants named herein were responsible for the contents and dissemination of the registration statement and prospectus, which were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Thomas, Wapnick, and the Director Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the registration statement and prospectus and ensure that they were true and accurate and not misleading. Accordingly, Thomas, Wapnick, and the Director Defendants are liable to Plaintiffs

and the other members of the Class.

87. By reason of the conduct alleged herein, Defendants violated Section 11 of the Securities Act.

88. Plaintiffs and the other members of the Class acquired Metagenomi common stock pursuant or traceable to the Company's registration statement and prospectus filed in conjunction with the initial public offering and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Class sustained damages, and the price of Metagenomi's shares declined substantially due to material misstatements in the registration statement and prospectus.

89. This claim was brought within one year after the discovery of the untrue statements and omissions and within three years of the date of the initial public offering.

90. By virtue of the foregoing, Plaintiffs and the other members of the Class are entitled to damages under Section 11, as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

## COUNT II

**Violation of Section 15 of the Securities Act**

**Against Thomas, Wapnick, and the Director Defendants**

91. Plaintiffs repeat and reallege each and every allegation contained in Count I, *supra*. Plaintiffs specifically disclaims any allegations that are based on fraud, recklessness, or intentional misconduct.

92. This Count is brought by Plaintiffs against Thomas, Wapnick, and the Director Defendants pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class.

93. This Count is asserted against Thomas, Wapnick, and the Director Defendants, each of whom possessed the power to control, and did control, directly and/or indirectly, the actions of Metagenomi at all relevant times.

94. Thomas, Wapnick, and the Director Defendants were each control persons of Metagenomi by virtue of their positions as directors, senior officers, and/or

authorized representatives of the Company. Thomas, Wapnick, and the Director Defendants had the power and authority to control the contents of Metagenomi's registration statement and prospectus and had the ability and opportunity to prevent their issuance or cause them to be corrected.

95. As a direct and proximate result of said wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchase of Metagenomi securities.

96. This claim is brought within the applicable statute of limitations.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, pray for relief as follows:

A. Determining that this action is a proper class action, certifying Plaintiffs as a class representative under Federal Rule of Civil Procedure 23 and Plaintiff's counsel as class counsel;

B. Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages, sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees and;

D. Such other and further relief as the Court may deem proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiffs demand a jury trial of all issues involved, now, or in the future, in this action.

Dated: April 4, 2025

BRONSTEIN GEWIRTZ & GROSSMAN, LLP

By: /s/ *Michael J. Boyle, Jr.*
Michael J. Boyle, Jr.

Michael J. Boyle, Jr (SBN 258560)
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
4200 Regent Street, Suite 200
Columbus, OH 43219
T: (614) 578-5582
mboyle@bgandg.com

Peretz Bronstein, Esq.*
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd St., Suite 4600
New York, NY 10165
T: (212) 697-6484
F: (212) 697-7296
peretz@bgandg.com

Jennifer Pafiti (SBN 282790)
POMERANTZ, LLP
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
Samantha Daniels
(*pro hac vice* application forthcoming)
POMERANTZ, LLP
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

Adam M. Apton (SBN 316506)
LEVI & KORSINSKY, LLP
aapton@zlk.com
1160 Battery Street Wast, Suite 100
San Francisco, CA 94111
T: (415) 373-1671

*Attorneys for Plaintiffs*

* Will seek *pro hac vice* admission