POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Counsel for Lead Plaintiff Movant Mingxi Bi*
*and Proposed Co-Lead Counsel for the Class*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| KEVIN VREELAND, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> METAGENOMI INC., BRIAN C. THOMAS, PAMELA WAPNICK, JUERGEN ECKHARDT, SEBASTIAN BERNALES, RISA STACK, and WILLARD DERE, <br><br> Defendants. | Case No.: 5:24-cv-06765-EKL <br><br> MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS <br><br> <u>CLASS ACTION</u> <br><br> Date:  September 10, 2025 <br> Time:  10:00 a.m. <br> Judge:  Hon. Eumi K Lee <br> Courtroom:  7 – 4th Floor |

**TABLE OF CONTENTS**

I.     PRELIMINARY STATEMENT .................................................................................1

II.    STATEMENT OF RELEVANT FACTS .................................................................2

       A.    Metagenomi Goes Public, Touting Its Collaboration with Moderna.......................2

       B.    At the Time of the IPO, The Collaboration Between Moderna and Metagenomi
             Had Deteriorated, and Work on the PH1 Program Ceased........................................4

       C.    Unknown to Investors, At the Time of the IPO, Metagenomi Had Made No
             Material Progress On The Joint Moderna PH1 Program. .........................................5

       D.    The Truth Emerges. ...................................................................................................5

III.   ARGUMENT ...........................................................................................................6

       A.    Pleading Standards Governing Section 11 of the Securities Act.............................6

       B.    Plaintiffs' Section 11 Claim Does Not "Sound in Fraud." .......................................7

       C.    The AC Adequately Alleges Material Misstatements and Omissions.......................9

             1.    Statements About the Moderna Collaboration and the PH1 Program
                   Were False and Omitted Material Information.......................................10

             2.    Statements About the PH1 Program's 2024 Timeline Were False and
                   Omitted Material Information.................................................................18

             3.    The AC Adequately Pleads that Defendants Violated Item 105.............22

       D.    Defendants Fail to Meet Their "Heavy Burden" to Prove Negative Causation. ....24

       E.    The AC Adequately Pleads A Section 15 Claim. ..................................................25

IV.    CONCLUSION........................................................................................................25

PROOF OF SERVICE.........................................................................................................27

## TABLE OF AUTHORITIES

**Cases**                                                                                                                          **Page(s)**

*Allegheny Cnty. Employees' Ret. Sys. V. Energy Transfer LP*,
2021 WL 1264027 (E.D. Pa. 2021) ...............................................................................................22

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................................7

*Berson v. Applied Signal Tech., Inc.*,
527 F.3d 982 (9th Cir. 2008) .................................................................................9, 10, 12, 23

*Bos. Ret. Sys. v. Uber Technologies, Inc.*,
2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) ........................................................................21

*Brown v. Ambow Educ. Holding Ltd.*,
2014 WL 523166 (C.D. Cal. Feb. 6, 2014)............................................................................25

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006) .....................................................................................12

*Callan v. Motricity Inc.*,
2013 WL 195194 (W.D. Wash. Jan. 17, 2013)........................................................................13

*Cisneros v. Allianz Life*,
2019 WL 9656383 (N.D. Cal. Dec. 2, 2019)..........................................................................25

*Cornwell v. Credit Suisse Grp.*,
689 F. Supp. 2d 629 (S.D.N.Y. 2010)....................................................................................14

*Doyun Kim v. Advanced Micro Devices, Inc.*,
2019 WL 2232545 (N.D. Cal. May 23, 2019)........................................................................23

*E. Öhman J:or Fonder AB v. NVIDIA Corp.*,
81 F.4th 918 (9th Cir. 2023) .............................................................................................9, 15

*Felipe v. Playstudios Inc.*,
2024 WL 1380802 (D. Nev. Mar. 31, 2024) ..........................................................................23

*Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*,
501 F. Supp. 3d 735 (N.D. Cal. 2020) ....................................................................................21

*Gammel v. Hewlett-Packard Co.*,
2013 WL 1947525 (C.D. Cal. May 8, 2013) ..........................................................................17

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
63 F.4th 762 (9th Cir. 2023) .....................................................................................16, 21, 23

ii

*Greenberg v. Sunrun Inc.*,
 233 F. Supp. 3d 764 (N.D. Cal. 2017) ...........................................................................14

*Herman & MacLean v. Huddleston*,
 459 U.S. 375 (1983) ...........................................................................................................6

*Hildes v. Arthur Andersen LLP*,
 734 F.3d 854 (9th Cir. 2013) ............................................................................................6

*Hoang v. ContextLogic, Inc.*,
 2024 WL 4471316 (N.D. Cal. Aug. 22, 2024) ...........................................................25

*Hodges v. Akeena Solar, Inc.*,
 2010 WL 3705345 (N.D. Cal. May 20, 2010) ............................................................12

*Hutchins v. NBTY, Inc.*,
 2012 WL 1078823 (E.D.N.Y. Mar. 30, 2012) ...........................................................17

*In re Acadia Pharm. Inc. Sec. Litig.*,
 2020 WL 2838686 (S.D. Cal. June 1, 2020) ................................................................9

*In re Alstom SA Sec. Litig.*,
 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .........................................................................15

*In re Amgen Inc. Sec. Litig.*,
 2014 WL 12585809 (C.D. Cal. Aug. 4, 2014) ...........................................................22

*In re APAC Teleservice, Inc. Sec. Litig.*,
 1999 WL 1052004 (S.D.N.Y. Nov. 19, 1999) ...........................................................13

*In re Ariad Pharms*,
 842 F.3d 744 (1st Cir. 2016) ..........................................................................................20

*In re Axsome Theraps., Inc. Sec. Litig.*,
 2025 WL 965265 (S.D.N.Y. Mar. 31, 2025) .......................................................16, 19

*In re Celera Corp. Sec. Litig.*,
 2013 WL 4726097 (N.D. Cal. Sept. 3, 2013) ............................................................16

*In re Charles Schwab Corp. Sec. Litig.*,
 257 F.R.D. 534 (N.D. Cal. 2009).................................................................................7, 9

*In re Emergent BioSolutions Inc. Sec. Litig.*,
 2023 WL 5671608 (D. Md. Sept. 1, 2023) .................................................................20

*In re Equifax Inc. Sec. Litig.*,
 357 F. Supp. 3d 1189 (N.D. Ga. 2019) ........................................................................21

*In re Gilead Scis. Sec Litig.*,
   536 F.3d 1049 (9th Cir. 2008) ..................................................................................................7

*In re Immune Response Sec. Litig.*,
   375 F. Supp. 2d 983 (S.D. Cal. 2005)......................................................................................15

*In re Intuitive Surgical Sec. Litig.*,
   65 F. Supp. 3d 821, 831 (N.D. Cal. 2014) ...............................................................................9

*In re Intuitive Surgical Sec. Litig.*,
   2017 WL 4355072 (N.D. Cal. Sept. 29, 2017) ........................................................................21

*In re Lyft Inc. Sec. Litig.*,
   484 F. Supp. 3d 758 (N.D. Cal. 2020) ..............................................................................22, 23

*In re Merix Corp. Sec. Litig.*,
   275 F. App'x 599 (9th Cir. 2008) .............................................................................................9

*In re Nuvelo, Inc. Sec. Litig.*,
   2008 WL 5114325 (N.D. Cal. Dec. 4, 2008)...........................................................................20

*In re Orion Sec. Litig.*,
   2009 WL 2601952 (S.D.N.Y. Aug. 20, 2009)...........................................................................8

*In re Pivotal Sec. Litig.*,
   2020 WL 4193384 (N.D. Cal. July 21, 2020)..........................................................................23

*In re Snap Sec. Litig.*,
   2018 WL 2972528 (C.D. Cal. June 7, 2018) ...........................................................................22

*In re Stable Rd. Acquisition Corp. Sec. Litig.*,
   2022 WL 2762213 (C.D. Cal. July 13, 2022)..........................................................................23

*In re STEC Inc. Sec. Litig.*,
   2011 WL 2669217 (C.D. Cal. June 17, 2011) .........................................................................12

*In re Stratosphere Corp. Sec. Litig.*,
   1 F. Supp. 2d 1096 (D. Nev. 1998)..........................................................................................17

*In re Talis Biomedical Corp. Sec. Litig.*,
   2022 WL 17551984 (N.D. Cal. Dec. 9, 2022)...................................................................14, 19

*In re Vaxart, Inc. Sec. Litig.*,
   576 F. Supp. 3d 663 (N.D. Cal. 2021) ............................................................................ *passim*

*In re Violin Memory Sec. Litig.*,
   2014 WL 5525946 (N.D. Cal. Oct. 31, 2014)........................................................................7, 8

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS –
5:24-cv-06765-EKL

*In re Vivendi, S.A. Sec. Litig.*,
838 F.3d 223 (2d Cir. 2016)..................................................................................................15

*In re Worlds of Wonder Sec. Litig.*,
35 F.3d 1407 (9th Cir.1994) ...................................................................................................24

*Irvine v. ImClone Sys., Inc.*,
2003 WL 21297285 (S.D.N.Y. June 4, 2003) ..................................................................18, 20

*Kendall v. Odonate Theraps., Inc.*,
2021 WL 3406271 (S.D. Cal. Aug. 4, 2021) ....................................................................10, 19

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) ...............................................................................................9, 12

*Knollenberg v. Harmonic, Inc.*,
152 F. App'x 674 (9th Cir. 2005) .............................................................................................7

*Kovtun v. VIVUS, Inc.*,
2012 WL 4477647 (N.D. Cal. Sept. 27, 2012) ......................................................................20

*Mallen v. Alphatec Holdings, Inc.*,
861 F. Supp. 2d 1111 (S.D. Cal. 2012).................................................................................14

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
65 F.3d 1044 (2nd Cir.1995)..................................................................................................24

*Merritt v. Molecular Partners AG*,
2024 WL 495140 (S.D.N.Y. Feb. 5, 2024)............................................................................14

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ...................................................................................21

*Mulligan v. Impax Lab'ys, Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .....................................................................................15

*Murphy v. Precision Castparts Corp.*,
2017 WL 3084274 (D. Or. June 27, 2017) .............................................................................20

*Odeh v. Immunomedics, Inc.*,
2020 WL 4381924 (D.N.J. July 31, 2020)..............................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2014).............................................................................................................6, 24

*Pinter v. Dahl*,
486 U.S. 622 (1988)................................................................................................................17

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS –
5:24-cv-06765-EKL

*Pirani v. Slack Techs., Inc.*,
 445 F.Supp.3d at 385-86 ..................................................................................................22

*Rafton v. Rydex Series Funda*,
 2011 WL 31114 (N.D. Cal. Jan. 5, 2011) .......................................................................24

*Rieckborn v. Jefferies LLC*,
 81 F. Supp. 3d 902 (N.D. Cal. 2015) ...............................................................................13

*Rihn v. Acadia Pharmaceuticals, Inc.*,
 2016 WL 5076147 (S.D. Cal. Sept. 19, 2016) ...........................................................18, 19, 20

*Roberti v. OSI Sys., Inc.*,
 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015).................................................................16

*Rubke v. Capitol Bancorp, Ltd.*,
 551 F.3d 1156 (9th Cir. 2009) .......................................................................................6, 9

*Safron Cap. Corp. v. Leadis Tech., Inc.*,
 274 F. App'x 540 (9th Cir. 2008) ...................................................................................7, 9

*Schueneman v. Arena Pharms., Inc.*,
 840 F.3d 698 (9th Cir. 2016) .....................................................................................2, 9, 12

*Scott Kuhne v. Gossamer Bio, Inc. et al.*,
 2021 WL 1529934 (S.D. Cal. Apr. 19, 2021)................................................................25

*SEC v. Capital Gains Research Bureau*,
 375 U.S. 180 (1963).......................................................................................................6

*Silverstrand Invs. V. AMAG Pharms., Inc.*,
 707 F.3d 95 (1st Cir. 2013)............................................................................................22

*Sinnathurai v. Novavax, Inc.*,
 645 F.Supp.3d 495 (D. Md. 2022)..................................................................................19

*Starr v. Baca*,
 652 F.3d 1202 (9th Cir. 2011) ........................................................................................7

*State Treasurer of Mich. v. Countrywide Fin. Corp.*,
 2011 WL 13220150 (C.D. Cal. Aug. 22, 2011).............................................................24

*Tarapara v. K12 Inc.*,
 2017 WL 3727112 (N.D. Cal. Aug. 30, 2017) ...............................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
 551 U.S. 308 (2007)........................................................................................................7

*Todd v. STAAR Surgical Co.*,
    2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) ...........................................................................16

*Vess v. Ciba-Geigy Corp. USA*,
    317 F.3d 1097 (9th Cir. 2003) ........................................................................................7, 9

*Wandel v. Jing Gao*,
    590 F. Supp. 3d 630 (S.D.N.Y. 2022)..............................................................................8, 23

*Weiner v. Tivity Health, Inc.*,
    365 F. Supp. 3d 900 (M.D. Tenn. 2019)................................................................................13

*Yanek v. Staar Surgical Co.*,
    388 F.Supp.2d 1110 (C.D. Cal. 2005) ...................................................................................20

**Statutes**

15 U.S.C. § 77k..............................................................................................................6, 8, 24

Exchange Act ..............................................................................................................................6

PSLRA ...........................................................................................................................6, 15, 16

Securities Act ........................................................................................................... *passim*

**Regulations**

17 C.F.R. § 229.105 .................................................................................................................22

**Rules**

Rule 8 ......................................................................................................................................7, 9

Rule 9 .............................................................................................................................6, 7, 8, 9

Rule 12(b)(6)...............................................................................................................................7

## I.    PRELIMINARY STATEMENT

In February 2024, preclinical pharmaceutical company, Metagenomi Inc. ("Metagenomi" or the "Company"), went public, offering investors the chance to get in on the ground floor of its "novel" gene-editing technology to target disease. Although this early-stage clinical company had no approved products for sale, it represented that its technology was backed by the resources and expertise of pharmaceutical-titan Moderna pursuant to a partnership collaboration analysts had valued at $3 billion dollars.

As the IPO offering documents touted, that collaboration was ongoing, productive, and would continue; for instance, it had generated groundbreaking data for treatment of PH1 (a disease that leads to kidney failure) and this Metagenomi-Moderna PH1 project would yield more milestone data by the end of 2024. Investors were excited by the opportunity to support this Moderna-backed collaboration, and the IPO was a success, raising over $93 million dollars.

That is why, less than three months after the IPO, on May 1, 2024, the market was shocked to learn that Metagenomi's partnership with Moderna had been terminated. Analysts wondered at the timing, so close to the IPO, given that Metagenomi framed this collaboration as "a critical part of [its] core thesis" and that Metagenomi's "los[s] [of] a partner like Moderna at this early stage in development raises more questions than answers"—sending Metagenomi's stock tumbling.

At the time of the IPO, however, this shock—and resulting financial losses to Plaintiffs—were knowable outcomes. Behind the scenes at Metagenomi, former employees ("CWs") confirm the partnership between Moderna and Metagenomi began deteriorating in mid-2023 and was effectively over by the time of the IPO in February 2024. They convey how Moderna was dissatisfied with Metagenomi's performance, had rejected the Company's data packages, had gutted the collaboration's ongoing projects, and had rejected the partnership's 2024 budget—leading to the cessation of project meetings in early 2024, all pre-IPO. They also conveyed how after Moderna became "unhappy" with Metagenomi's data, this failing relationship had turned toxic, with meetings becoming increasingly contentious and then ceasing entirely. Indeed, one CW working intimately on the much-lauded PH1 joint project revealed that those meetings stopped pre-IPO in early 2024 and how at that time (and until the time this CW departed the Company in June 2024), no meaningful work was being done on that program—let alone enough that could support the IPO Offering Documents' timeline for new milestone data. At bottom, at the time of the IPO, the relationship was "dead in the water."

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS – 5:24-cv-06765-EKL

Yet the IPO Offering Documents misleadingly touted this collaboration as an ongoing and productive one (which was likely to bear fruit in 2024), while omitting this key, material information in violation of Section 11. Defendants' main rejoinder is to cabin the statements touting the collaboration as "accurate" or a "simple summary of terms"—an argument contrary to the well-known maxim that these statements nonetheless can mislead by omission. Consistent with decades long jurisprudence in this Circuit, once Defendants *choose* to speak favorably about the Moderna partnership, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information. *Schueneman v. Arena Pharms., Inc*., 840 F.3d 698, 705-06 (9th Cir. 2016).

Defendants failed to do so. And in their Motion, Defendants simply ignore or attempt to discredit the well-plead allegations confirming the falsity of their statements assuring investors that the Company was collaborating and will continue to collaborate with Moderna. Moreover, given these knowable and already-realized issues at the time of the IPO, Defendants cannot hide behind boilerplate "risk warnings" cautioning in the abstract that it was always theoretically possible that unnamed collaborators *could* terminate joint projects. As the AC alleges, that risk already had materialized. Accepting Defendants' facile framing otherwise would only empower the kind of misstatements and omissions Section 11 was designed to prevent.

For all the foregoing reasons, and those discussed below, the Motions should be denied.

## II.    STATEMENT OF RELEVANT FACTS

### A.    Metagenomi Goes Public, Touting Its Collaboration with Moderna.

Metagenomi is a preclinical-stage pharmaceutical company claiming to have technology for "next generation gene editing tools" "with the potential to address multiple diseases." AC¶28. As a Company at the preclinical stage, it has no commercial products for sale. AC¶32.

On October 29, 2021, Metagenomi announced a collaboration with Moderna to develop Metagenomi's gene-editing tools for commercial-stage products. AC¶25. Under that agreement, Moderna would provide its own proprietary technology, resources, and funding on at least three (but up to 12) projects, and in return, would receive some share of the sales of any commercially developed products. AC¶¶26, 30. This symbiotic research-and-development arrangement would last at least four years, with the option to extend another three. At the time, the Company framed this "collaboration" as a "milestone" on Metagenomi's "journey to create transformational

genome-engineering based medicines." AC¶28. As Defendant CEO Thomas conveyed, "[o]ur partnership with Moderna is designed to accelerate the creation of genetic medicines using Metagenomi's naturally derived, compact, modular and precise gene editing systems," and "[t]his partnership will enhance our shared vision to forge transformative therapeutics for patients." AC¶29.

On February 13, 2024, Metagenomi conducted its IPO. AC¶7. In its IPO Offering Documents, it promoted the Moderna collaboration as a cornerstone of the Company's commercial potential. AC¶30. It stated that "[w]e will collaborate with Moderna on the research and development of *in vivo* genome editing therapies directed at certain targets and the commercialization of such genome editing therapies" on at least three (but up to 12) gene-editing projects and discussed the time period of four (but up to seven) years. *Id.* With some of those projects, the IPO Offering Documents conveyed "we will work together with Moderna on the co-development and commercialization of products and share costs and profits equally." *Id.*

The IPO Offering Documents lauded the progress of one such ongoing joint project to combat PH1, a disease that often leads to kidney failure. The IPO Offering Document made clear that "[t]his [PH1] program is partnered with Moderna for both development and commercialization." AC¶32. It stated that "[a]long with our partner ModernaTX, Inc. ('Moderna'), we have achieved preclinical proof-of-concept" to combat PH1 and that "[w]e are in the final stages of confirming the candidate to take into [non-human-primate] NHP studies and expect to have NHP data in 2024 to support final development candidate selection." AC¶31. It further boasted that this symbiotic "partnership enables us to leverage Moderna's expertise in mRNA and LNP [lipid nanoparticle delivery] technology to ensure efficient delivery of our nuclease to hepatocytes," while "[i]n turn, we provide the novel programmable nuclease and guide chemistry to support precise targeting of the HAO1 genes" (the genes needed to target and address PH1). AC¶32. "In addition to further validating our therapeutic platform, to the best of our knowledge this program represents the first time a type V nuclease is being developed for a therapeutic in vivo genome editing approach." *Id.*

As shown, the relationship with Moderna was a core part of Metagenomi's pitch to potential investors. AC¶34. Analysts estimated this collaboration was valued at $3 billion. Gabrielle Mason, *Moderna exits gene editing deal worth up to $3B biobucks, leaving Metagenomi in the spotlight*, Fierce Biotech (May 1, 2024 4:00 PM), available at

https://www.fiercebiotech.com/biotech/moderna-exits-gene-editing-deal-worth-3b-biobucks-leaving-metagenomi-spotlight.    Based on these recommendations, the IPO was successful; Metagenomi raised $93.8 million. AC¶35.

**B.    At the Time of the IPO, The Collaboration Between Moderna and Metagenomi Had Deteriorated, and Work on the PH1 Program Ceased.**

However, the true state of the Moderna collaboration at the time of the IPO was materially different than represented.  Behind the scenes, former employees ("CWs") confirmed that the relationship began deteriorating in mid-2023 and was effectively over by the time of the IPO in February 2024.  AC¶¶37-50.  Indeed, in mid-2023, Moderna became "[un]happy with the data coming out of Metagenomi." AC¶41.  For instance, in August 2023, Metagenomi submitted a "specificity package" to Moderna (which would have demonstrated the accuracy of Metagenomi's gene-editing technology), but Moderna rejected this data as "not meeting its expectations," as incorrect or inaccurate.  AC¶44.

After that, Moderna began gutting the resources for those joint projects. AC¶43. One such employee (CW1, a researcher hired specifically to work on the Moderna-partnered projects) conveyed that before this time, CW1 observed no difficulties or concerns with funding; "money was no issue." AC¶40.  After these failures, however, Moderna began stripping the projects of necessary funding, forcing CW1's project leader to resign "out of frustration" over the lack of needed resources. *Id*. Moderna also took the unprecedented action rejecting the 2024 budget proposal for those projects and shutting down at least one of Moderna's in-house teams. AC¶43. Moreover, communication between Metagenomi and Moderna stopped well before the IPO in February 2024 "because the relationship was so bad." AC¶48.  Among those that worked with Moderna "[a] lot of people on the project knew it was dead in the water."

One such former employee (CW2) was a Senior Director who was directly involved in the Moderna collaboration for the PH1 program.  AC¶¶45, 51. While the program seemed "productive" when CW2 joined the team in October 2023—with Metagenomi and Moderna conducting regularly scheduled discussions about what the program would accomplish by the first two quarters of 2024—that changed in late 2023 and early 2024, prior to the IPO.  *Id*. After Moderna became "unhappy" with Metagenomi's data, meetings became increasingly contentious,

and then ceased entirely.  AC¶¶46-47.  By February 2024, prior to the IPO, CW2 conveyed that while these joint meetings remained on calendar, no one from either side attended.  AC¶47.

### C.    Unknown to Investors, At the Time of the IPO, Metagenomi Had Made No Material Progress On The Joint Moderna PH1 Program.

Apart from the end of the Moderna relationship, CW2 also witnessed the progress—or lack thereof—on the PH1 program.  AC¶51.  Contrary to the Company's statement that, along with "partner" Moderna, "[w]e are in the final stages of confirming the candidate to take into NHP studies and expect to have NHP data in 2024 to support final development candidate selection," CW2 revealed that no meaningful progress had occurred on the PH1 project that could support that timeline.  AC¶52.

As CW2 conveyed, "it costs millions of dollars and months of planning to execute trials with nonhuman primate (NHP) models," but in "none of the meetings or work" that CW2 participated in were there any discussions of securing a facility, materials, or a contractor to test the Company's HOA1 gene editor (necessary for the PH1 project) on nonhuman primates.  AC¶52. In CW2's professional experience, to obtain such data by the end of 2024, these preparation efforts should have been well in progress as of the IPO in February 2024.  AC¶53.  In reality, the project was "directionless"; no meaningful work had been done on these preparation efforts at the time of the IPO or in the months after when CW2 left the Company months later in June 2024.  AC¶51.

### D.    The Truth Emerges.

On May 1, 2024—less than three months after the IPO—Metagenomi publicly revealed that the partnership with Moderna had been terminated.  AC¶51. While Metagenomi tried to frame the termination as a means to "regain full development rights to its wholly-owned base editing" systems, as one analyst noted, this massive loss "removes a potential source of incoming cash in the form of milestone payments as well as the expertise that the larger company [Moderna] offered in messenger RNA."  AC¶¶54, 56.

Analysts also noted the shocking timing so soon after the IPO; mere weeks earlier Metagenomi had touted the Moderna collaboration as a key means to commercialization.  AC¶55. Indeed, one analyst called the announcement "very surprising" given that the Moderna partnership

was framed by Metagenomi as "a critical part of [its] core thesis." *Id*. Upon this pronouncement, J.P. Morgan "lowered its rating of Metagenomi," citing "the recent termination of its partnership with Moderna," with "[t]he investment bank sa[ying] it was 'very surprised' by … [the] termination news," and that "***losing a partner like Moderna at this early stage in development raises more questions than answers***." *Id*. (emphasis added).

The market agreed that the termination was a material blow. AC¶57. Metagenomi's stock price tanked from $7.04 per share on May 1, 2024, to $6.17 per share on May 2, 2024. *Id*. And since the announcement, Metagenomi stock has continued to decline; shortly after, in July 2024, Metagenomi's Chief Science Officer responsible for "oversee[ing] … advancement of the Company's next generation gene editing technologies" resigned. AC¶58. The market took this as another indication of the weakness of Metagenomi's research program. *Id*. Following this announcement, the stock dropped from a high of $5.25 to $3.88 by the end of July. *Id*.

## III.    ARGUMENT

### A.    Pleading Standards Governing Section 11 of the Securities Act

The Securities Act "substitute[d] a philosophy of full disclosure for the philosophy of caveat emptor." *SEC v. Capital Gains Research Bureau*, 375 U.S. 180, 186 (1963). As such, "[l]iability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

"Section 11 places a relatively minimal burden on a plaintiff." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 859 (9th Cir. 2013) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Liability under Section 11 requires that only "any part of the registration statement … contain[] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." 15 U.S.C. § 77k(a). "Section 11 thus creates two ways to hold issuers liable for the contents of a registration statement—one focusing on what the statement says and the other on what it leaves out." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 179 (2014). No proof of scienter, reliance, or loss causation is required. *See Rubke v. Capitol Bancorp, Ltd*., 551 F.3d 1156, 1161 (9th Cir. 2009).

Unlike claims brought under the Exchange Act, claims brought under Sections 11 are not subject to the heightened "particularity" pleading requirements of the PSLRA or Rule 9(b). *See,*

*e.g.*, *Knollenberg v. Harmonic, Inc.*, 152 F. App'x 674, 683 (9th Cir. 2005). Instead, they are governed by the ordinary notice pleading standards of Rule 8(a), which requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

Thus, pleading a claim under Rule 8 "is not an onerous burden" "the statement need only give the defendant[s] fair notice of what … the claim is and the grounds upon which it rests" and as such "[s]pecific facts are not necessary." *In re Violin Memory Sec. Litig.*, 2014 WL 5525946, at *8 (N.D. Cal. Oct. 31, 2014). In applying this standard, courts accept as true all factual allegations and draw all reasonable inferences in plaintiff's favor. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). Moreover, "'Rule 8(a) does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' to support the allegations." *Starr v. Baca*, 652 F.3d 1202, 1217 (9th Cir. 2011) (emphasis in original) (quoting *Twombly*, 550 U.S. at 556).

"[A] district court ruling on a motion to dismiss is not sitting as a trier of fact … so long as the plaintiff alleges facts to support a theory that is not facially implausible, the court's skepticism is best reserved for later stages of the proceedings." *In re Gilead Scis. Sec Litig.*, 536 F.3d 1049, 1057 (9th Cir. 2008). "If there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under Rule 12(b)(6)." *Id*. Thus, "[t]he standard at this stage of the litigation is not that plaintiff's explanation must be true or even probable. The factual allegations of the complaint need only 'plausibly suggest an entitlement to relief.'" *Id.*

## B.    Plaintiffs' Section 11 Claim Does Not "Sound in Fraud."

"Section 11 claims … are not inherently fraud-based." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 545 (N.D. Cal. 2009). Defendants incorrectly claim that the AC "sounds in fraud," triggering Rule 9(b). ECF No. 40 ("MTD") 7. The AC solely asserts non-fraud Securities Act claims and "neither specifically alleges fraud, nor does it allege facts that necessarily constitute fraud." *Safron Cap. Corp. v. Leadis Tech., Inc.*, 274 F. App'x 540, 541 (9th Cir. 2008) (citing *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1104-05 (9th Cir. 2003)). Defendants' argument to the contrary misstates the AC's non-fraud allegations.

Defendants' assertion that the AC alleges a "unified course of fraudulent conduct" or "intentional" misconduct (MTD 7), is flatly wrong:  The AC solely asserts non-fraud claims, repeatedly disclaims fraud and alleges strict liability and negligence.  AC¶24 ("Plaintiffs do not allege nor claim to have information supporting a claim for intentional or fraudulent misconduct. This pleading is based entirely on allegations of negligent or mistaken misstatements and/or omissions."); AC¶85 ("Metagenomi is strictly liable for the materially untrue statements contained in the registration statement and prospectus and their failure to be complete and accurate."). The AC's allegations demonstrate consistent with Section 11 itself, which proscribes "untrue" and "misleading" statements.  15 U.S.C. § 77k.

Defendants point only to allegations that "Metagenomi employees knew that the relationship with Moderna was likely to be terminated," (MTD 7), but such knowledge of employees does not mean the statements in the IPO Offering Documents (put forth by Metagenomi senior management) were fraudulently and intentionally withheld—that something is knowable to Defendants and not disclosed can be done negligently. *In re Orion Sec. Litig*., 2009 WL 2601952, at *1 (S.D.N.Y. Aug. 20, 2009) ("[T]hat a fact was known and not disclosed does not mean, as a matter of law, that the circumstances of the resulting omission sound in fraud.").  And such allegations simply demonstrate Defendants' knowledge of the risk thus triggering a disclosure duty under Item 105; as Defendants own authorities make clear, "[t]o state a claim under Item 105, an issuer must know, at the time of the IPO, about an undisclosed risk factor that could seriously affect its present or future business." *Wandel v. Jing Gao*, 590 F. Supp. 3d 630, 646 (S.D.N.Y. 2022).

As the AC makes clear, Defendants "had a duty to disclose this information to future shareholders in its IPO prospectus" and "even if mistakenly or negligently, Metagenomi did the opposite." AC¶65. Plaintiffs have not alleged that Defendants intentionally concealed any facts. AC¶¶82, 91 ("Plaintiffs specifically disclaim any allegations that are based on fraud, recklessness, or intentional misconduct.").  Accordingly, the Court should decline to infer allegations of fraud. *See Violin*, 2014 WL 5525946, at *8 (declining to infer fraud where no allegation defendants "intentionally" concealed information).

Defendants' argument is foreclosed not only by the AC, but Ninth Circuit precedent. Tellingly, Defendants cite no case applying Rule 9(b) to a Securities Act-only pleading.  Indeed, "[n]o published Ninth Circuit decision has been found … applying Rule 9(b)'s particularity

requirement to a Section 11 claim where, as here, the underlying conduct was not also alleged to have constituted fraud." *Schwab*, 257 F.R.D. at 546. Instead, "[c]ourts generally apply Rule 8 to Section 11 claims where *only* non-fraud bases for liability are pled." *Id*. Defendants' irrelevant cases involved fraud claims and Securities Act claims based on the same misstatements and allegations. MTD 7 (citing *Rubke*, 551 F.3d at 1161 ("exact same factual allegations [used] to allege violations of section 11 [and] fraudulent conduct under section 10(b)"); *Vess*, 317 F.3d at 1103 (not a securities fraud case)). And where courts have erroneously applied Rule 9(b) to Securities Act-only pleadings—as Defendants urge—the Circuit has reversed. *See Safron*, 274 F. App'x at 541; *In re Merix Corp. Sec. Litig.*, 275 F. App'x 599, 599 (9th Cir. 2008).

### C.    The AC Adequately Alleges Material Misstatements and Omissions.

A statement is false if it is "contradict[ed]" by existing facts. *E. Öhman J:or Fonder AB v. NVIDIA Corp.*, 81 F.4th 918, 928 (9th Cir. 2023). In addition, a statement is misleading "if it would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).

Thus, even if the statement is literally accurate, an actionable statement "may be misleading if it omits material information" and "[d]isclosure is required … when necessary 'to make statements made, in the light of the circumstances under which they were made, not misleading.'" *Khoja, Inc. v. Orexigen Therapeutics, Inc.*, 899 F.3d, 988, 1008-09 (9th Cir. 2018). "'[C]ompanies can control what they have to disclose … by controlling what they say to the market.'" *Id*. "But once defendants choose to tout positive information to the market, they are bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Id*. (quoting *Schueneman*, 840 F.3d at 705-06).

The AC does "identify those specific statements as the basis for its claims." *Contra* MTD 9. For each challenged statement, the AC includes the date, the speaker or author thereof, location of the statement, makes clear what portion of each statement is misleading often with use of bold and italicized font, and after each misstatement provides the specific reasons why the statements were misleading when made. Nothing more is required. *See In re Intuitive Surgical Sec. Litig.*, 65 F. Supp. 3d 821, 831 (N.D. Cal. 2014); *In re Acadia Pharm. Inc. Sec. Litig.*, 2020 WL 2838686, at *4 (S.D. Cal. June 1, 2020).

### 1. Statements About the Moderna Collaboration and the PH1 Program Were False and Omitted Material Information.

The IPO Offering Documents represented that those buying in to the newly public Company were also buying in to a Moderna-backed relationship. In it, Defendants represented that Metagenomi and Moderna would actively collaborate on the development of commercial products, touting that "we and Moderna will collaborate on" gene-editing "programs" and that "we will work together with Moderna on the co-development and commercialization of products" on certain programs "and share costs and profits equally." AC¶30.

For the PH1 program, the IPO Offering Documents touted the success of this collaboration, stating "[a]long with our partner Moderna," "we have achieved preclinical proof-of-concept" to combat PH1 and "[w]e are in the final stages of confirming the candidate to take into [non-human-primate] NHP studies"—a key regulatory milestone—"and expect to have NHP data in 2024 to support final development candidate selection." AC¶31. And it boasted that this symbiotic "partnership enables us to leverage Moderna's expertise" while Metagenomi "in turn" "provid[es] the novel programmable" gene-editing technology needed to "precis[ely] target[] … the HAO1 genes" to address PH1. AC¶32. Defendants also described this program's success as "further validating [Metagenomi's] therapeutic platform," and one that is groundbreaking "to the best of our knowledge this program represents the first time a type V nuclease is being developed for a therapeutic in vivo genome editing approach." *Id*.

These statements promoting the Modern collaboration were misleading as they "would give a reasonable investor the 'impression of a state of affairs that differs in a material way from the one that actually exists.'" *Berson*, 527 F.3d at 985. Indeed, statements that Metagenomi "is partnered with" and "will collaborate" with Moderna on Metagenomi's gene-editing programs— and highlighting the symbiotic nature of the pairing—were false and misleading because they gave the impression that the Moderna-backed programs were proceeding as normal with "no significant setbacks." *Kendall v. Odonate Theraps., Inc.*, 2021 WL 3406271, at *5 (S.D. Cal. Aug. 4, 2021) (under 9(b), statements, including that they were "to complete enrollment of [a Phase 3 study] in the second half of 2019," gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks"). Moreover, for the PH1 programs, stating that "[w]e are in the final stages of confirming the candidate to take into [non-human-primate] NHP studies and

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS –
5:24-cv-06765-EKL

expect to have NHP data in 2024 to support final development candidate selection" also gave the impression that the Moderna collaboration not only was proceeding without any material setbacks, but that the companies' collaboration was a working success and one likely to bear fruit.

As the CWs made clear, just the opposite was true. As several CWs conveyed, at the time of the February 2024 IPO, the relationship between Metagenomi and Moderna was over in all ways except in name only. Defendants' contention that "[n]othing in the AC suggests" the statements are "false or misleading" (MTD 12) ignores the well plead facts that, in late-2023 and in early 2024, prior to the IPO, Moderna had taken unprecedented actions of (1) rejecting the 2024 budget for the joint programs, (2) gutting the resources needed to fund the joint programs—such drastic measures causing Metagenomi employees to leave "out of frustration" for the lack of needed resources (AC¶¶40, 43)—(3) shutting down its in-house Moderna team (AC¶41); (4) rejecting the data "specificity package" submitted by Metagenomi that should have—but did not— demonstrate the accuracy of Metagenomi's gene editing as "not meeting its [Moderna's] expectations" (AC¶44); *see also* AC¶41 (Moderna "was not happy with the data coming out of Metagenomi"; joint program "was showing some problems in producing data that the technology was effective"); *see also* AC¶44 (CW5 "caught a major error in how the Moderna partnership team may have been cross referencing the gene editor"); AC¶46 (CW2, starting in late 2023, Moderna was "unhappy with the preclinical research that was being done"); (5) failing to attend regularly scheduled meetings about the PH1 project (AC¶¶45-47); and (6) ceasing communications about the PH1 project (AC¶48).

Defendant also ignore allegations from those CWs describing how, starting in mid-2023, Moderna became increasingly "unhappy" with Metagenomi's data and performance; the Company failed to "produc[e] data that [Metagenomi's] technology was effective"—to the point where meetings had devolved into screaming matches—triggering unprecedented project cuts by Moderna. AC¶¶41, 45. Indeed, as CW2 conveyed, at the time of the IPO, the PH1 project was effectively over; Moderna and Metagenomi were no longer collaborating on it, the previously scheduled meetings to further the project were abandoned, and no meaningful work necessary to take the PH1 program to the next preclinical stage (NHP) was planned. CW2 related that these meetings remained on the calendar through March 2024, but CW2 made clear that *before the IPO*, "by February 2024, these joint meetings remained on calendar, but CW2 reported ***that no one from either side attended those meetings as of the beginning of 2024***." AC¶47; *contra* MTD 13,

14 (attempting to muddy CW2's reported timeline).  AC¶¶47, 51-53.  Together, this made it clear to those on the ground that the collaboration was over.  AC¶47.

Just as in *Berson*, where the defendants touted multi-million-dollar contracts as part of the company's backlog (*i.e.*, work to be performed), without disclosing that the work "had been halted and was likely to be lost forever," 527 F.3d at 984, here Defendants misleadingly hyped the Moderna collaboration without disclosing the material facts that the arrangement was over, the programs "halted," and those potential multi-billion-dollar profits "likely to be lost forever."  They are therefore actionable.

Defendants' attempt to write off them as "accurate" (*e.g.*, MTD 11) ignores that "once defendants choose to tout positive information to the market, they [are] bound to do so in a manner that wouldn't mislead investors, including disclosing adverse information that cuts against the positive information." *Khoja*, 899 F.3d at 1008–09 (quoting *Schueneman*, 840 F.3d at 705–06).  Accordingly, "even statements 'literally true on their face' can mislead a reasonable investor 'when considered in context.'" *In re Vaxart, Inc. Sec. Litig.*, 576 F. Supp. 3d 663, 671–72 (N.D. Cal. 2021).  "By announcing the [Moderna] Agreement" and collaboration "Defendants had a duty to do so in a way that would not mislead investors." *In re STEC Inc. Sec. Litig.*, 2011 WL 2669217, at *6–7 (C.D. Cal. June 17, 2011).

Here, given the pleaded facts showing the imperiled collaboration "[a]s in *Berson,* the Court 'cannot say, as a matter of law, that defendants fulfilled this duty,' because in context, the statements could have been reasonably interpreted to misrepresent the nature of the [Moderna] Agreement" and the true state of the collaboration.  *Id.* (under 9(b), "Defendants materially misrepresented the nature of the Agreement by omitting to state that the Agreement was not an ordinary course contract and did not reflect an increase in the level of EMC's requirements," but was a "one-time purchase agreement"); *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250 (D. Mass. 2006) (under 9(b), in touting the "lucrative nature of impending agreements, Defendants assumed an obligation, in announcing [] new relationship with Intel, to convey the whole truth"); *Hodges v. Akeena Solar, Inc.*, 2010 WL 3705345, at *3-*4 (N.D. Cal. May 20, 2010) (under 9(b), plaintiffs "adequately alleged false or misleading statements" where defendants touted a "lucrative licensing and distribution agreement[,]" but the agreement lacked "legally enforceable rights").

Defendants contend "nothing in the Registration Statement gave rise to a 'false or misleading impression' about the state of the collaboration because it contained no subjective

statements describing the collaboration." MTD 13. As an initial matter, that is untrue. Far from being a "simple summary of terms" (MTD 12), the statements also spoke about the "working" relationship in present and future terms, the synergies underlying the collaboration, and the successful results of that collaboration—including claiming that it "further validat[es] [Metagenomi's] therapeutic platform" and represented a novel "first time" breakthrough. AC¶ 32. As courts recognize, "[w]ords, after all, cannot be viewed 'in complete isolation' but must instead be 'read in light of all the information then available to the market' to decide if they 'conveyed a false or misleading impression.'" *Vaxart*, 576 F. Supp. 3d at 670 (quoting Ninth Circuit authority). Defendants deny the unmistakable impression: that the collaboration with Moderna was ***an active, ongoing, and productive one***. *E.g.*, AC¶¶30-32.

Indeed, courts routinely recognize that statements promoting a key business relationship are misleading where complaint alleges facts showing that relationship is imperiled. *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 906 (M.D. Tenn. 2019) (under 9(b), health insurance company "continued to represent that its [customer] relationship with [United HealthCare] UHC was the same" despite facts showing company was aware UHC intended to compete in the same market); *Vaxart*, 576 F. Supp. 3d at 670-71 (under 9(b), "announcement that [issuer] had partnered with Attwill" to manufacture vaccines "was materially misleading" given plead facts showing partnership did not have capabilities or personnel to produce those vaccines); *In re APAC Teleservice, Inc. Sec. Litig.*, 1999 WL 1052004, at *6 (S.D.N.Y. Nov. 19, 1999) (under 9(b), "statements made by the defendants stressing the importance of the APAC-UPS relationship" "misleading because defendants allegedly failed to disclose that APAC had been unable to meet performance criteria mandated by UPS" "le[ading] UPS to cut APAC's invoices"); *Tarapara v. K12 Inc.*, 2017 WL 3727112, at *15 (N.D. Cal. Aug. 30, 2017) (under 9(b), "the facts as pled support the reasonable inference that defendants knew as of June 2012 that there would be no management contract after June 2015. Nevertheless, K12 did not disclose this fact").

Defendants' authorities are not to the contrary. MTD 11. Unlike in *Callan v. Motricity Inc.*, 2013 WL 195194, at *12 (W.D. Wash. Jan. 17, 2013), the AC contains statements to support a reasonable inference it was knowable at the time of the IPO that "the contract with [the partner] was, or would be, unprofitable." Moreover, in *Rieckborn v. Jefferies LLC*, 81 F. Supp. 3d 902, 923 (N.D. Cal. 2015) (cited at MTD 11), given the "write down occurred more than two years after the IPO," the court concluded that "is not a sufficient indicator of how or why the reserve figures

in the registration statements were misleading when made," but here, the public announcement of the collaboration termination occurred mere weeks after the IPO. Thus, "[t]aken together, 'the information then available to the market' gave the impression that [Metagenomi and Moderna] could well be on the cusp of achieving something momentous." *Vaxart*, 576 F. Supp. 3d at 670. As the AC alleges, just the opposite was true.

Defendants cite *Mallen v. Alphatec Holdings, Inc.*, 861 F. Supp. 2d 1111, 1130 (S.D. Cal. 2012), but there, the Court held that statement that the company "expected to have 'cross-selling opportunities' from the sale of … current products was" not actionable because "Plaintiffs … do not allege what specific products were sold at that time or under what circumstances the sale agreements were terminated." Here, the AC is replete with allegations showing "the circumstances" undermining the positive statements touting the Metagenomi-Moderna collaboration. And *Merritt v. Molecular Partners AG*, 2024 WL 495140, *5 (S.D.N.Y. Feb. 5, 2024)—where the court dismissed an omission argument where plaintiff failed "to allege facts showing a serious conflict between [defendants'] expectations regarding the [] agreement and" the allegedly omitted facts—is inapposite for the same reason.

Defendants cite *Greenberg v. Sunrun Inc.*, 233 F. Supp. 3d 764, 772 (N.D. Cal. 2017) for the proposition that there is "no duty to disclose rumblings of regulatory change, material or otherwise," but there, "[t]he Prospectus stressed time and again that regulatory change was a threat to its business, and investors had publicly available information to assess that risk," *id.*, whereas here, the IPO Offering Documents touted the collaboration while leaving investors in the dark about its true status. And in *In re Talis Biomedical Corp. Sec. Litig.*, 2022 WL 17551984, at *15 (N.D. Cal. Dec. 9, 2022) (cited at MTD 12), the court concluded that the CW "allegations … lack any specific facts about why, at the time of the Registration Statement, it was not reasonable for Talis to expect that the cartridge manufacturing lines would scale to full capacity through 2021," whereas here, the AC contains specific facts showing that at the time of the IPO, the Moderna collaboration was over, including facts showing previously regular meetings were no longer taking place, the 2024 budget was not approved, and that Moderna was dissatisfied with Metagenomi' performance.

Rather than deal with the allegations, Defendants attempt to discredit the CWs who supply them. MTD 12-15. But CW allegations will be credited at the pleading stage if they are described with sufficient detail to "support the probability that a person in the position occupied by the source

would possess the information alleged." *NVIDIA*, 81 F.4th at 938. This can involve many considerations, but as this Court has held it is typically satisfied by describing each CW's "job descriptions and responsibilities." *Mulligan v. Impax Lab'ys, Inc.*, 36 F. Supp. 3d 942, 962 (N.D. Cal. 2014) ("[N]umbering the confidential witnesses and describing [their] job descriptions and responsibilities constitutes a 'large degree of specificity'"). The AC does just that.

Defendants also ask the Court to ignore CW allegations that information about the end of the collaboration was generally "[a] lot of people ... knew" the collaboration was "dead in the water." AC¶48. However, such allegations may be considered as part of the holistic approach the Court is required to take. *See, e.g.*, *Cornwell v. Credit Suisse Grp.*, 689 F. Supp. 2d 629, 637-38 (S.D.N.Y. 2010) (considering allegations of "widespread knowledge" of problems at company); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 505 (S.D.N.Y. 2005) (considering allegation that "everyone knew" of the problems). Far from being able to dismiss these realities as "at most routine challenges and messiness," (MTD 13) the CWs show the collaboration was over in all but name only.

Defendants next claim the isolated phrase that Metagenomi and Moderna "will collaborate" is "forward-looking" and thus insulated under the bespeaks caution doctrine. MTD 15-16. Not so.

First, as Defendants acknowledge (*e.g.*, MTD 3), the IPO Offering Documents speak directly about Metagenomi's and Moderna's ***present, ongoing*** partnership—the statements they "will collaborate" in the future in this context plainly represent that the collaboration is proceeding well and will continue; it is thus a statement of mixed present fact that describe the *current* state of the Moderna collaboration. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 246 (2d Cir. 2016) ("present representations" may be "embedded within statements that Vivendi deems forward-looking"); *Vaxart*, 576 F. Supp. 3d at 672 (talking about future partnership: "[n]or is the Attwill announcement protected as a 'forward-looking statement' under the PSLRA. It made a claim about the 'current ... state' of Attwill's manufacturing capabilities."). Defendants' attempt to parse the statements into separate segments is improper. *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033 (S.D. Cal. 2005) (in evaluating the safe harbor, the court held "the court should determine whether the statement as a whole, not a particular part, is misleading").

Second, even if considered forward-looking, the bespeaks caution doctrine does not apply given Defendants failed to provide meaningful cautionary language. Defendants cite (MTD 17)

the purely hypothetical risk disclosures that "disagreements with [Metagenomi's] collaborators … *might* cause delays or terminations," but none of those disclosures about "collaborators" generally included the real, present risk that the Moderna-backed projects were over.  Such "'[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *In re Axsome Theraps., Inc. Sec. Litig.*, 2025 WL 965265, at *6 (S.D.N.Y. Mar. 31, 2025).

Third, even if the alleged misstatements were forward-looking, the doctrine does not protect material omissions of "present fact."  *Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *10 (C.D. Cal. Apr. 12, 2016) ("'to the extent Plaintiffs … challenge Defendants' alleged omission of present facts with respect to the challenged statements, the PSLRA's safe harbor does not apply'"); *see also Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *9 (C.D. Cal. Feb. 27, 2015) (same); *see also In re Celera Corp. Sec. Litig.*, 2013 WL 4726097, at *2 (N.D. Cal. Sept. 3, 2013) (statement not forward-looking because "it was an omission of a historical fact"). Here, the AC alleges that Defendants omitted, *i.e.*, failed to disclose, material information about the present problems plaguing the collaboration at the time of the IPO.

It is likewise immaterial that the IPO Prospectus disclosed that Moderna may terminate the agreement.  MTD 17.  Formal termination of that agreement is not the standard here; what matters is whether the AC has plead enough facts to undercut the Defendants' positive statements about the collaboration.  *Supra* 10-13.  For instance, in *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, defendants issued a press release that stated "[w]e look forward to completing our pending transaction with [the target company]," while omitting material information that made the merger *less* likely to close—namely, a phone call in which the target company informed the defendant company that it was "considering not closing the merger." 63 F.4th 762, 779-80 (9th Cir. 2023). The Ninth Circuit held the defendants' statements were materially false and misleading because the fact that the target was "considering not closing the merger" was: "*certainly inconsistent with [the defendant company's] statement that it expected the merger to close*"; "[e]ven if [defendant's] executives sincerely believed that the merger would still close as planned, [defendants'] statement did not 'fairly align[ ] with the information in the issuer's possession at the time'—i.e., that [the target company] was *reconsidering the deal*." *Id*. at 772, 779 (emphasis added).  Accordingly, as in *Glazer*, Defendants failed to disclose material adverse facts that were "certainly inconsistent with" Defendants' statements that they "will collaborate" with Moderna on these projects. *Glazer*,

63 F.4th at 772; *Hutchins v. NBTY, Inc.*, 2012 WL 1078823, at \*6 (E.D.N.Y. Mar. 30, 2012) (failure to disclose "*potential* loss" of largest customer actionable) (emphasis added).

Defendants do not (and cannot) contend this information is immaterial. Defendants' halfhearted attempts to undermine the materiality of these omissions only confirm their importance. That Metagenomi had other agreements with Ionis or Affini-T does not change these facts that plainly render this material. MTD 4. For instance, Moderna's market cap is significantly larger than Ionis. As of June 23, 2024, Ionis Pharmaceuticals has a market capitalization of approximately $4.8 billion, while Moderna's market cap is around $10.96 billion. Moreover, that the IPO Offering Document mentions Moderna on 42 pages of the Prospectus (MTD 4) *furthers*, not diminishes, an inference of materiality.

Indeed, as a plucky pharmaceutical startup for the first time seeking outside investors, stating that its technology is endorsed by and partnered with a household name like Moderna with comparatively unlimited resources is a major selling point—indeed, analysts valued this partnership at *up to $3 billion*. As analysts responded once the truth was revealed, Metagenomi's IPO had framed this collaboration as "a critical part of [Metagenomi's] core thesis." AC¶55. Thus, the sudden "loss[]" of "a partner like Moderna at this early stage in [Metagenomi's] development" not only "removes a potential source of incoming cash in the form of milestone payments as well as the expertise that the larger company offered in messenger RNA," but this "loss [of the Moderna partnership] at this early stage" also "raises more questions than answers." AC¶¶55-56.

Defendants thus "exploited a gap in the public's knowledge" and "capitalized on hype it had generated around its" Moderna-backed projects. *Vaxart*, 576 F. Supp. 3d at 671. And they did so at a critical time, when raising funds for its IPO. Indeed, the short timing—less than three months—between the IPO and the public announcement that the Moderna agreement was formally over is a further indication that Defendants' statements were false when made. *See, e.g.*, *Gammel v. Hewlett-Packard Co.*, 2013 WL 1947525, at \*16 (C.D. Cal. May 8, 2013) (temporal proximity between defendants' statements and a corrective disclosure, four to eleven weeks, supported plaintiffs' falsity allegations); *see also In re Stratosphere Corp. Sec. Litig.*, 1 F. Supp. 2d 1096, 1112 (D. Nev. 1998) ("The shortness of time between later revealed truth and prior statements can be circumstantial evidence that the optimistic statements were false or misleading when made."). This thus is precisely the kind of omission Section 11 was designed to prevent. *Pinter v. Dahl*, 486 U.S. 622, 638 (1988) ("The primary purpose of the Securities Act is to protect investors by

requiring publication of material information thought necessary to allow them to make informed investment decisions concerning public offerings of securities.").

### 2. Statements About the PH1 Program's 2024 Timeline Were False and Omitted Material Information.

As shown, Defendants made materially misleading statements touting the Moderna-partnered PH1 program. Defendants also made specific and misleading representations about the timing of the Moderna-partnered PH1 program milestone in 2024. "***Along with our partner, Moderna***," "***[w]e are in the final stages of confirming the candidate to take into [non-human-primate] NHP studies and expect to have [non-human-primate] NHP data in 2024 to support final development candidate selection***." AC¶31 (emphasis added).

But, as a CW2 (a Senior Director working on the PH1 project) made clear, at the time of the IPO, no meaningful work had been done on the PH1 project to have any such data available in 2024. Indeed, "in none of the meetings or work that CW2 participated in were there any discussions of securing a facility, materials, or a contractor to test the Company's HOA1 gene editor (necessary for the PH1 project) on nonhuman primates" and any PH1 meetings ceased by the time of the IPO. AC¶52. It thus was also misleading for Defendants to portray that the PH1 program would meet this deadline; it is therefore actionable. *Irvine v. ImClone Sys., Inc.*, 2003 WL 21297285, at *1 (S.D.N.Y. June 4, 2003) (under 9(b), statement company "reasonably expected approval by the FDA in early 2002" actionable where defendants knew "it was not reasonably foreseeable that the FDA would approve Erbitux on that time line"); *Odeh v. Immunomedics, Inc.*, 2020 WL 4381924, at *6 (D.N.J. July 31, 2020) (under 9(b), positive statements about FDA review actionable based on awareness of data breach that "could seriously jeopardize" approval).

The court in *Rihn v. Acadia Pharmaceuticals, Inc.*, for instance, addressed the case where Defendants had proclaimed that a certain drug application was "on track" to meet an upcoming deadline. 2016 WL 5076147, at *6 (S.D. Cal. Sept. 19, 2016). Defendants, however, omitted that "Acadia did not perform a mock inspection of these [manufacturing] systems," and "[a]ccordingly, when Defendants represented that the NDA was 'on track' to be submitted by March 31, 2015, without mentioning that no meaningful assessment of the manufacturing and quality assurance

systems had been conducted, Defendants created an impression of a state of affairs that differed in a material way from the one that actually existed." *Id*. While "Defendants led the public to believe that all appropriate steps had been taken to make sure that the NDA was ready for review by the deadline and that barring unforeseen circumstances, the NDA would be submitted by that date," "[i]n actuality, Defendants lacked information regarding whether the necessary infrastructure for commercial-scale operations was in place," rendering "Defendants' assurances that the NDA remained 'on track' for submission by March 31, 2015 … materially misleading." *Id*.

The same reasoning applies here. "Defendants led the public to believe that all appropriate steps had been taken to make sure that" the PH1 program candidate selection would be "ready … by the deadline and that barring unforeseen circumstances, the" trial would begin "by that date," when in reality, the Company had not taken the major steps necessary to meet this deadline and the collaboration on the project was effectively over. AC¶¶47, 51-53, 66-67; *Acadia Pharms.*, 2016 WL 5076147, at *6. These observed, pre-IPO facts distinguish *Talis*, 2022 WL 17551984, at *15 (cited at MTD 20), where the court found the complaint failed to "provide a basis for this opinion" other than conclusory assertions that the company had not done sufficient work to meet its goal.

Failure to disclose this reality gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks." *Odonate Theraps.*, 2021 WL 3406271, at *5 (under 9(b), statements company was "to complete enrollment of [a study] in the second half of 2019," gave a misleading "impression that [the study] was proceeding as expected, with no significant setbacks"); *Sinnathurai v. Novavax, Inc.*, 645 F.Supp.3d 495, 519-20 (D. Md. 2022) (under 9(b), statements of manufacturing status that "left out another important factor in the delay" actionable where company "faced significant manufacturing concerns"); *Axsome Theraps.*, 2025 WL 965265, at *5 (under 9(b), statement that "2021 was a year of continued progress which has put the Company in a position to potentially launch" drug was "misleading because they created an impression that the Company was not facing supply issues, when, in reality, the SAC alleges that Axsome was unable to produce sufficient [drug component] for at least a year").

By touting this timeline—while omitting the truth about the Moderna PH1 collaboration— those statements "necessarily implied that there would be no serious impediments to timely" PH1 data and, as such, it would be misleading to omit "facts suggesting a possible delay," including that no meaningful work on the PH1 program was occurring and that the necessary steps to get

this data was not even being discussed, let alone being executed. *Yanek v. Staar Surgical Co.*, 388 F.Supp.2d 1110, 1130 (C.D. Cal. 2005); *In re Emergent BioSolutions Inc. Sec. Litig.*, 2023 WL 5671608, at *13-14, *19 (D. Md. Sept. 1, 2023) (under 9(b), pre-commercial statements touting ability to support "large scale manufacturing" misled investors given issues that would impact "how risky it would be" for firm to achieve that goal). "While management may have held out hope of achieving this result, the expression of that hope without disclosure of recent troubling developments created an impermissible risk of misleading investors." *In re Ariad Pharms*, 842 F.3d 744, 753 (1st Cir. 2016).

Nor does the bespeaks caution doctrine shield these statements. MTD 21. *First*, they are not forward-looking but are statements of present fact that describe the *current* status of the PH1 program. *Irvine*, 2003 WL 21297285, at *1 (under 9(b), company statement that it "reasonably **expected** approval by the FDA in early 2002" was actionable where defendants knew "it was not reasonably foreseeable that the FDA would approve Erbitux on that time line") (emphasis added); *see Acadia Pharms.*, 2016 WL 5076147, at *6 (holding defendants "'on track' assurances were representations about the *current* state of affairs" of "the [drug application] process"); *Murphy v. Precision Castparts Corp.*, 2017 WL 3084274, at *12-13 (D. Or. June 27, 2017) ("[Defendants'] assertion … there is no change to the [2016 EPS] framework … is a representation of [Defendants'] current market status, *i.e.*, hitting benchmarks along the way to achieving the 2016 goal."), *R. & R. adopted*, 2017 WL 3610523 (D. Or. Aug. 22, 2017). Nor was there sufficiently cautionary language. Defendants cite to disclosures that "collaborators *may* delay" or *may* "stop" "preclinical studies and clinical trials," and warned that "[c]linical drug development involves a lengthy and expensive process, with an uncertain outcome." MTD 21(emphasis added). That does not suffice.

Defendants' authorities are not on point. MTD 21. In *Kovtun v. VIVUS, Inc.*, 2012 WL 4477647, at *13 (N.D. Cal. Sept. 27, 2012), the court concluded the warnings were adequate given "[i]t cannot be over-emphasized that plaintiff does not claim … even that there was a way that defendants could have known whether the FDA would or would not approve [its drug candidate]," which is not the case here; the AC pleads facts showing "defendants could have known" that Moderna was withdrawing, no meaningful work had been done on the PH1 program at the time of the IPO, and thus that the PH1 program would not meet the touted timeline. And in *In re Nuvelo, Inc. Sec. Litig.*, 2008 WL 5114325 (N.D. Cal. Dec. 4, 2008), "Nuvelo disclosed that off-label drugs were being used to treat" the disease at issue PAO, and "[b]ased on that disclosure, plaintiffs have

not alleged facts sufficient to demonstrate that defendants made misleading or inaccurate statements about … potential competition from off-label uses of other drugs." *Id*. at \*15. No such precise and obvious cautionary language warned of the already-present status of the PH1 program.

Contending this assurance is mere "opinion" is also off the mark. MTD 21. As CW2 conveyed, as of the IPO, Defendants had not taken even the most basic and rudimentary steps to prepare for an impending PH1 NHP trial. CW2 noted multiple significant red flags, including the lack of any contractor to test the gene-editor needed for NHP testing, facility, materials, plans, or timelines. *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1219 (N.D. Ga. 2019) (finding falsity by comparing company's practice to "basic industry standards"). As in *Glazer*, Defendants failed to disclose material adverse facts that were "certainly inconsistent with" Defendants' statements that there would be such PH1 data in 2024. 63 F.4th at 772, 779. These devastating facts, concealed from investors, demonstrate that Defendants omitted material information that would undermine the so-called "opinion" to a reasonable investor. *See, e.g.*, *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1023-24 (N.D. Cal. 2020) (opinion actionable where defendants stated they were remediating disclosed accounting weaknesses when, in reality, those issues were getting worse); *In re Intuitive Surgical Sec. Litig.*, 2017 WL 4355072, at \*2-3 (N.D. Cal. Sept. 29, 2017); *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at \*8 (N.D. Cal. Aug. 7, 2020), (opinion that Uber "expect[ed] … growth to continue" misleading without disclosing that the company had sustained its largest losses to date and was planning layoffs and restructuring).

Defendants also contend "[t]he AC lacks any allegations to establish that these opinion statements were not actually believed by Defendants at the time they were made or that they omitted facts about their inquiry" citing *Ferraro Fam. Found., Inc. v. Corcept Therapeutics Inc.*, 501 F. Supp. 3d 735, 762 (N.D. Cal. 2020). MTD 22. But there, the court concluded the statement that the company "believes" it promotion of a drug candidate was not "off-label," was an inactionable opinion given "[t]he small number of off-label promotions … that Plaintiffs have adequately pled is insufficient to render Defendants' statements" as "lacking a reasonable basis." *Corcept*, 501 F. Supp. 3d at 761-62. Here, even if couched as an opinion, the statement that Defendants expect data from the Moderna-collaborated PH1 program by the end of 2024 is enough to show this "lacks a reasonable basis" given allegations that the Moderna PH1 collaboration was over and, at the time of the IPO, no meaningful preparation on the PH1 program had occurred.

Nor is this assurance a subjective "interpretation[] of the results of [a] clinical stud[y]" but a statement about the purported progress of that trial.  *Contra* MTD 22.  Plaintiffs don't base this claim on the opinion of the FDA, some other third party, or even Plaintiffs' own interpretation of the data—Defendants themselves were in control of this information bearing on PH1's status and timeline.  Thus "with this argument, Defendants knock down a strawman." *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *16-17 (C.D. Cal. Aug. 4, 2014).

For instance, in *Allegheny Cnty. Employees' Ret. Sys. v. Energy Transfer LP*, 2021 WL 1264027, at *6-8 (E.D. Pa. 2021), plaintiffs alleged facts showing that it was clear that the pipelines, troubled from the start, could not be built in the stated timeline. The Court held: "Plaintiffs have plausibly alleged that the statements did not fairly align with the information in the issuer's possession at the time. Plaintiffs are not, as Defendants argue, merely alleging that the speakers offered opinions which later turned out to be wrong. They present numerous facts on the ground that directly contradicted the statements—facts they contend were known to the speakers and could not be reconciled with the assurances offered to investors." *Id*. at *7 (internal quotations and citations omitted). That is exactly the case here—Defendants failed to disclose known or knowable facts about PH1 program that could not be reconciled with the timeline presented to investors.

### 3.    The AC Adequately Pleads that Defendants Violated Item 105.

Defendants also had an independent duty under Item 105 to "provide," "under the caption 'Risk Factors,'" "a discussion of the material factors that make an investment in the registrant or offering speculative or risky" and to "adequately describe[] the risk." 17 C.F.R. § 229.105; *Pirani v. Slack Techs., Inc.*, 445 F.Supp.3d at 385-86; *In re Snap Sec. Litig.*, 2018 WL 2972528, at *8 (C.D. Cal. June 7, 2018); *In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769 n.4, (N.D. Cal. 2020).

"The risk factor section is intended to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities." Securities Offering Reform, 70 Fed. Reg. 44721, 44786 (Aug. 3, 2005). This should include a discussion of how "the risk factor could adversely [a]ffect the registrant's present or future business expectations." *Silverstrand Invs. V. AMAG Pharms., Inc.*, 707 F.3d 95, 103 (1st Cir. 2013).

The misleading risk factors alleged in ¶¶AC70-71 (*e.g.*, that "disagreements with collaborators … *might* cause delays or terminations" and "[i]f these collaborations are not successful, our business *could* be adversely affected") are actionable because these "risks" had already materialized before the IPO. AC¶¶45, 47-50. Such "risk disclosures can be misleading to investors when they 'speak[] entirely of as-yet-unrealized risks and contingencies' and do not 'alert[] the reader that some of the[] risks may already have come to fruition.'" *Glazer*, 63 F.4th at 781; *see also In re Lyft Inc. Sec. Litig.*, 484 F. Supp. 3d 758, 769-70 (N.D. Cal. 2020) (risk factor misleading where "warned-of risks" already materialized); *Berson*, 527 F.3d at 986 (statement that "speaks entirely of as-yet-unrealized risks and contingencies" does not "alert[] the reader that some of these risks may already have come to fruition"); *In re Stable Rd. Acquisition Corp. Sec. Litig.*, 2022 WL 2762213, at *9 (C.D. Cal. July 13, 2022) (risk disclosures may be actionable where they "do not 'alert[] the reader that some of the[] risks may already have come to fruition'"); *Felipe v. Playstudios Inc.*, 2024 WL 1380802, at *13 (D. Nev. Mar. 31, 2024) (falsely framing risks as potential when they had "already come to fruition" violates Item 105).

Defendants' authorities are not to the contrary.  In *Doyun Kim v. Advanced Micro Devices, Inc.*, 2019 WL 2232545 (N.D. Cal. May 23, 2019) (cited at MTD 23), the court acknowledged that "[r]isk disclosures may be actionable 'as material omissions when the disclosures speak to entirely ... as-yet-unrealized risks and contingencies' and fail to alert 'the reader that some of these risks may already have come to fruition.'" *Id*. at *7.  But there, the allegedly actionable risk-disclosure omissions (about "discovery of vulnerabilities in [the issuer's] processors") had not "come to fruition" nor did it match the actual disclosure, which warned only of "cyber-attacks, data breaches, and resulting litigation." *Id*. at *8.  Here, Metagenomi's risk disclosures about *hypothetical* ends to its collaborations, did not warn of the actual, realized risk that the Moderna collaboration was already over.  *In re Pivotal Sec. Litig.*, 2020 WL 4193384 (N.D. Cal. July 21, 2020) is off the mark for the same reason.  There, the court dismissed an Item 105 claim where the "risk disclosures discuss[ed] exactly" the vague "risks posed by the increasingly apparent obsolescence of its primary offerings, competitive disadvantages hampering its sales force, and consequently lengthening sales cycles, diminished growth and other financial metrics." *Id*. at *8.

And in *Wandel*, (cited at MTD 23), the court held that "the risk of COVID-19 was neither known nor knowable to Phoenix Tree by the start of the IPO" given "[b]y that date, health officials had identified 41 cases of viral infection—a statistic that 'appeared unremarkable at the time'"—

and "[n]or had any human-to-human transmission been confirmed." 590 F. Supp. 3d at 641. Under those circumstances, "[i]t is therefore only with hindsight that Plaintiffs can allege that Phoenix Tree failed to discuss the possibility that a few dozen cases of a respiratory illness would explode into a ruinous pandemic"; "[s]uch an omission is not actionable." *Id*. Here, far from pleading "only with hindsight" that the Moderna collaboration was over by the IPO, the AC alleges specific facts showing that at this time, Moderna and Metagenomi had ceased worked on the touted PH1 program, that Moderna was dissatisfied with Metagenomi's data, and Moderna had gutting the existing programs and rejected the 2024 budget. As Defendants failed to disclose the known problems with the Moderna relationship, these were events presenting known risks that were reasonably likely to—and, when they came to fruition during the Class Period, did—adversely affect Metagenomi's financial condition and results. They thus violated Item 105. *Rafton v. Rydex Series Funda*, 2011 WL 31114, at *7 (N.D. Cal. Jan. 5, 2011) ("where the adequacy of the disclosures is at issue, Defendants must make a 'stringent showing' that 'reasonable minds could not disagree' that the disclosures were not misleading").

### D.     Defendants Fail to Meet Their "Heavy Burden" to Prove Negative Causation.

Plaintiffs are not required to plead loss causation for their § 11 claim. *See, e.g.*, *Omnicare*, 575 U.S. at 179. The absence of loss causation, also known as "negative causation," is an affirmative defense that defendants bear a "heavy burden" to plead and prove that the alleged losses are not attributable to the alleged misrepresentation or omission. *See* 15 U.S.C. § 77k(e); *see also McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1048 (2nd Cir.1995); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir.1994) (noting "heavy burden"). Overcoming this defense requires only that the misrepresentation or omission "touches upon the reasons for an investment's decline in value." *Id.* at 1422. Indeed, dismissal is "only appropriate if the complaint makes clear that there is no conceivable basis for loss causation." *State Treasurer of Mich. v. Countrywide Fin. Corp.*, 2011 WL 13220150, at *5 (C.D. Cal. Aug. 22, 2011).

That standard is easily met here. Defendants claim "Metagenomi's stock price dropped because the Agreement was terminated, not because the relationship between Moderna and Metagenomi was allegedly strained." MTD 25. But that simplistic comparison ignores the AC allegations that, at the time of the IPO, and unknown to investors, the Agreement was effectively

over.  As the AC pleads, upon the public revelation that the collaboration ended, the stock price dropped, harming investors.  AC¶¶57-59.  On its face, therefore, the AC pleads price impact.

In contrast, in *Brown v. Ambow Educ. Holding Ltd.*, 2014 WL 523166, at *15 (C.D. Cal. Feb. 6, 2014) (cited at MTD 25), the court found negative causation where "[n]one of the disclosures mention[ed]" the topics that were the basis for the alleged misstatements (e.g., "the acquisition of Changsha Tutoring," "the purported 'round tripping' of cash," or "the alleged recording of tuition revenue as software revenue").  The same is true of *Hoang v. ContextLogic, Inc.*, 2024 WL 4471316, at *13 (N.D. Cal. Aug. 22, 2024), where the court concluded that the disclosure (about "logistical problems") was not related to the basis for the misstatements (about "ad revenue").  In addition, in any event, defendants "disclosures show[ed] that these alleged facts were disclosed previously" so "[t]he information was thus not 'reveal[ed]'" by the disclosure.  *Id.* at *12. Finally, "[b]ecause an analysis of causation is often fact-intensive, negative causation is [an affirmative defense] generally [only] established by a defendant on a motion for summary judgment or at trial." *Scott Kuhne v. Gossamer Bio, Inc. et al.*, 2021 WL 1529934, at *7 (S.D. Cal. Apr. 19, 2021). This issue is simply "more appropriate for resolution at a later stage" and not a reason for dismissal.

### E.    The AC Adequately Pleads A Section 15 Claim.

Defendants' sole argument is that the Section 15 claim fails because Plaintiffs have failed to allege a primary violation under Section 11 or 12.  MTD 25.  Because, for the reasons discussed herein, Plaintiffs have adequately alleged a Section 11 claim, Defendants' motion to dismiss the Section 15 claim similarly should be denied.

### IV.    CONCLUSION

Defendants' motion should be denied.  Alternatively, Plaintiffs request leave to amend to cure any deficiencies. *Cisneros v. Allianz Life*, 2019 WL 9656383, at *4 (N.D. Cal. Dec. 2, 2019).

Dated: June 27, 2025                                    Respectfully submitted,

                                                        POMERANTZ LLP

/s/ Jennifer Pafiti
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
Samantha Daniels
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com
sdaniels@pomlaw.com

*Counsel for Lead Plaintiff Movant Mingxi Bi and Proposed Co-Lead Counsel for the Class*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
Peretz Bronstein
(*pro hac vice* application forthcoming)
60 East 42nd Street, Suite 4600
New York, New York 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Counsel for Lead Plaintiff Movant Mingxi Bi and Proposed Co-Lead Counsel for the Class*

26
MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS –
5:24-cv-06765-EKL

**PROOF OF SERVICE**

I hereby certify that on June 27, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF system.

*/s/ Jennifer Pafiti*
Jennifer Pafiti

MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION TO DISMISS –
5:24-cv-06765-EKL